508 F.2d 313
 5 Envtl. L. Rep. 20,494
 UNITED STATES of America, Plaintiff-Appellee,
v.
Francis Leo CAPPAERT et al., Defendants-Appellants, State of
Nevada ex rel, Roland D. Westergard, State
Engineer, Intervenor.
UNITED STATES of America, Plaintiff-Appellee,
v.
Francis Leo CAPPAERT et al., Defendants, State of Nevada ex
rel. Roland D.Westergard, State Engineer,
Intervenor-Appellant.
 Nos. 74-1690, 74-2186.
 United States Court of Appeals, Ninth Circuit.
 Dec. 4, 1974.
 
 Samuel S. Lionel, Lionel, Sawyer, Collins & Wartman, Las Vegas, Nev., for defendants-appellants.
 V. DeVoe Heaton, U.S. Atty., District of Nevada, Las Vegas, Nev., for plaintiff-appellee.
 Ralph E. Hunsaker, Phoenix, Ariz., for amicus curiae, Arizona Water Commission.
 George V. Allison and Peter D. Laxalt, Special Deputy Atty. Gen., Carson City, Nev., for State of Nevada.
 Before CARTER and CHOY, Circuit Judges, and SOLOMON,* District judge.
 OPINION
 SOLOMON, District Judge:
 Pupfish (cyprinodon diabolis) live in Devil's Hole, in the Death Valley National Monument in Nevada. They are a unique and endangered species. In an action filed by the United States (Government) to protect these fish, the district court limited the amount of water which the owners of a nearby cattle ranch may pump. The Cappaerts, owners of the ranch, and the State of Nevada, which intervened on ths side of the Cappaerts, appeal.
 The Cappaerts' ranch consists of 12,000 acres, of which 4,000 acres are in cultivation. The ranch, which represents an investment of more than 7 million dollars, has an annual payroll of more than $340,000 and employs more than 80 people. Between 1700 and 1800 head of cattle are fed on the ranch.
 The Cappaerts drilled wells and pump groundwater[1] on their land for irrigation. Devil's Hole, a part of the Death Valley National Monument, is located within three miles of several wells on the ranch. Devil's Hole Consists of a 40-acre tract in which there is a deep limestone cavern. At the bottom of this cavern there is a pool about 65 feet long, 10 feet wide, and more than 200 feet deep. There are steep rock walls on three sides of the pool, but on the fourth side there is a sloping rock shelf on which algae grows. This pool is part of the 4,500 square mile groundwater system from which the Cappaerts pump their water.
 The Devil's Hole Pupfish live in this pool. These pupfish evolved after the Death Valley Lake System dried up, isolating this species of fish from its ancestral stock. The pupfish population varies from 200 in the winter to 800 after spawning in the spring and depends for its survival on the sloping rock shelf which provides food and a spawning ground. The Devil's Hole Pupfish are less than one inch long and do not exist anywhere else in the world. They have been designated an endangered species under the Endangered Species Act of 1973, 16 U.S.C. 1533 (1974), 50 C.F.R. 17.
 The water level in the pool is measured from a copper washer which the U.S. Geological Survey placed on the shelf in 1962. Between 1962 and 1968 the average water level was 1.2 feet below the marker. In 1968, after the Cappaerts began to pump, the summer water level[2] steadily decreased: in 1970 to 3.17 feet below the marker; in 1971 to 3.48 feet and in 1972 to 3.9 feet. At these water levels large areas of the critical rock shelf are exposed. At 3.6 feet below the marker, 42 per cent of the shelf is exposed, and at 3.7 feet the exposure increases to 55 per cent. The shelf exposure decreases the algae production and limits the spawning area which in turn reduces the Devil's Hole Pupfish's chance to survive.
 On June 5, 1973, following a number of hearings, the court granted the Government's motion for a preliminary injunction. This injunction required that pumping on the Cappaerts' ranch be limited so that the mean water level of 3.0 feet below the copper washer be attained within 90 days. The court also appointed a special master to control the pumping of other wells in order to reach and maintain this water level.
 Among the extensive findings entered by the District Court were the following:
 '9. Through the Presidential Proclamation of January 17, 1952, and its publication in the Federal Register on January 23, 1952 (17 Fed.Reg. 691), the unappropriated waters in, on, under and appurtenant to Devil's Hole were withdrawn from private appropriation as against the United States and reserved to the extent necessary for the requirements and purposes of the said reservation.'
 'The purposes of the reservation of Devil's Hole as part of Death Valley National Monument includes the preservation of the pool of water and the preservation of the Devil's Hole pupfish (Cyprinodon diabolis) which live therein.'
 '14. The natural rock shelf and rubble thereon on which the Devil's Hole pupfish depend for feeding, reproduction and, hence, their survival, is nearly 100% Covered with water when there is a mean water level of 3.0 feet below the copper washer.'
 '16. The defendants' pumping of groundwater from wells known as Nos. 1, 2, 3, 4, 5 and 6, and 16 and 17, has drawn water from the springs and underground sources which comprise the supply for Devil's Hole. Because the defendants' wells and Devil's Hole are hydraulically connected, defendants' pumping has caused the water level in Devil's Hole to drop.'
 '24. In order to maintain a viable continuous population of Devil's Hole pupfish, the water level in Devil's Hole must be maintained above the natural rock shelf and the rubble thereon, which is a minimum of not less than 3.0 feet below the copper washer.'
 '25. If the water level at Devil's Hole drops below 3.0 feet below the copper washer, the survival of the Devil's Hole pupfish will be threatened, that is, the time of their becoming extinct in the natural evolutionary order will be accelerated.'
 Both the Cappaerts and the State of Nevada appealed. The Cappaerts also filed motions to modify, pending appeal, the preliminary injunction to permit them to pump down to 3.7 feet below the copper washer. Pending appeal, this Court permitted the Cappaerts to pump so long as the water level did not go lower than 3.3 feet below the copper washer.
 On January 17, 1952, President Truman, by Presidential Proclamation 2961, withdrew Devil's Hole from the public domain and made it part of the Death Valley National Monument. U.S.Code Cong. & Adm.News, 82d Cong., 2d Sess., Vol. 1 at p. 964 (1952); 17 Fed.Reg. 691. The Proclamation was issued under the Act for the Preservation of American Antiquities, 16 U.S.C. 431 (1974), which authorizes the President to declare '. . . objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments . . ..'
 The Government contends that the Proclamation, with its express reservation of the Devil's Hole Pool and the surrounding land from the public domain, contains an implied reservation of enough groundwater to assure preservation of the pupfish in that pool.
 The implied reservation of water doctrine originated in Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908).[3] The Court in Winters held that private landowners could not impair Indian rights in a river which formed one boundary of a reservation, even though the Congressional grant of the land to the Indians had not mentioned water rights. The land reserved for the Indians was arid. The Court held that a grant of water rights must be implied because Congress intended by the grant of land to encourage the Indians to become farmers.
 In Arizona v. California, 373 U.S. 546, 601, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), the Supreme Court extended the reservation doctrine of Winters to include waters reserved for federal lands which had been set aside for recreation, wildlife, or forests. This was reaffirmed and extended in United States v. District Court for Eagle County, 401 U.S. 520, 522-523, 91 S.Ct. 998, 1001 L.Ed.2d 278 (1971). There the Court held that the Federal Government's authority 'to reserve waters for the use and benefit of federally reserved lands . . .' extended to 'any federal enclave.'
 The Cappaerts contend, however, that the doctrine of implied reservation of water does not apply to groundwater, but only to surface water. Although these Supreme Court cases involved only surface water rights, the reservation of water doctrine is not so limited.
 Two cases in the Ninth Circuit approved the application of the doctrine of implied reservation of groundwater when water was needed to accomplish the purpose of the reservation. Nevada ex rel. Shamberger v. United States, 165 F.Supp. 600 (D.Nev.1958), aff'd on other grounds, 279 F.2d 699 (9th Cir 1960); Tweedy v. Texas Co., 286 F.Supp. 383 (D.Mont.1968).
 In our view the United States may reserve not only surface water, but also underground water.[4]
 The Cappaerts assert that the 1952 Presidential Proclamation was intended to preserve only the Devil's Hole pool with its unique limestone formationand not to protect the pupfish, and that therefore there was no implied reservation of groundwater. We reject that argument.
 The Proclamation added the Devil's Hole pool to the Death Valley National Monument after reciting:
 'WHEREAS the geologic evidence that this subterranean pool is an integral part of the hydrographic history of the Death Valley region is further confirmed by the presence in this pool of a peculiar race of desert fish, and zoologists have demonstrated that this race of fish, which is found nowhere else in the world, evolved only after the gradual drying up of the Death Valley Lake System isolated this fish population from the original ancestral stock that in Pleistocene times was common to the entire region; and
 'WHEREAS the said pool is of such outstanding scientific importance that it should be given special protection . . ..'
 The fundamental purpose of the reservation of the Devil's Hole pool was to assure that the pool would not suffer changes form its condition at the time the Proclamation was issued in 1952; that condition included the pool's unique inhabitants, the pupfish. The Proclamation referred to the significant contribution of the pupfish to the scientific importance of the Devil's Hole Pool; it implicitly reserved enough groundwater to assure preservation of the pupfish. This conclusion is reinforced by the National Park Service Act, 16 U.S.C. 1(1974), which states that 'the fundamental purpose' of all national parks and monuments is '. . . to conserve the scenery . . . and the wild life therein . . . by such means as will leave them unimpaired for the enjoyment of future generations.'
 The Cappaerts contend that under Nevada law they have ownership rights to the underground water which can only be taken from them by eminent domain. They assert that the 1952 Presidential Proclamation attempted to reserve underground water which belonged to their predecessor in interest.
 In 1890 and 1892, the State of Nevada by selection acquired fee simple title from the United States Government to the land now owned by the Cappaerts. The Desert Land Act of 1877, 43 U.S.C. 321 (1964), as construed in California-Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 162, 55 S.Ct. 725, 79 L.Ed. 1356 (1935), provides that a transfer of federal land out of the public domain after the date of the Act would not pass title to any unappropriated appurtenant water; water rights would be determined under the law of the state in which the land was located. Because water rights were severed from title in 1877, Nevada got no water rights in 1890 and 1892 when it acquired title to the Cappaerts' land. Therefore, the Cappaerts, as successors in interest, possess no water rights unless they or a predecessor acquired such rights under Nevada law.
 The Cappaerts argue that Nevada has adopted the old common law doctrine, established in Acton v. Blundell, 12 M. & W. 324 (Exch.Chamber 1843), that a landowner has unlimited dominion over all waters beneath his property. This doctrine, the Cappaerts contend, establishes their water rights as a matter of Nevada law.
 The Supreme Court of Nevada in Jones v. Adams, 19 Nev. 78, 6 P. 442 (1885), rejected that common law doctrine. The court adopted and applied the theory of prior appropriation[5] as the basis for determining water rights. The doctrine of prior appropriation was reaffirmed in Reno Smelting, Milling & Reduction Works v. C. C. Stevenson, 20 Nev. 269, 282, 21 P. 317 (1889).
 In 1913[6] and 1939,[7] Nevada enacted statutes providing that, subject to existing rights, all waters in Nevada belong to the public and may be appropriated as provided by statute, and not otherwise. Because no one had previously appropriated water rights through beneficial use, there were no 'existing rights' to water on the Cappaerts' land in 1939. Thereafter, water rights could only be acquired, as the statutes provided, by obtaining a permit from the state. N.R.S. 533.325.
 The constitutionality of the basic principles of the Nevada Water Code was upheld in Humboldt Lovelock Irrigation Light & Power Co. v. Smith, 25 F.Supp. 571 (D.Nev.1938). Such statutes which abolished common law water rights when the landowner had not made actual beneficial use of the water were held to be a valid exercise of the police power. California-Oregon Power Co. v. Beaver Portland Cement Co., 73 F.2d 555 (9th Cir. 1934), aff'd on other grounds, 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356 (1935).
 Here neither the Cappaerts nor their predecessors made actual beneficial use of water until 1968. Even if they had some common law claim, they had not established a vested property right in the water based on prior appropriations before Nevada declared that groundwater belonged to the public.
 Finally, the Cappaerts contend the Government is estopped from enjoining them from the unrestricted use of their wells located more than one mile from Devil's Hole. In 1969, the Cappaerts and the Government entered into a land exchange. The Cappaerts received land within one mile of Devil's Hole under a patent granting them 'all rights, privileges, immunities and appurtenances . . . subject to any vested and accrued water rights for mining, agriculture, manufacturing or other purposes . . ..' The Cappaerts have drilled wells and pumped water on this land.
 The Cappaerts admit they had no oral understanding with the Government agents about the water pumping, and they further admit that these agents made no oral representation. The Cappaerts argue, however, that the Government knew at the time of the land exchange change that water wells would be drilled, but that the Government specified only that no wells should be drilled within one mile of Devil's Hole. The Cappaerts say that they spent large sums of money in drilling the wells and in changing their farming operations, relying on their justifiable belief that they could drill wells and pump water without limitation.
 This contention lacks merit. Estoppel cannot be invoked against the Government under the facts of this case. The statement of Mr. Justice Black in United States v. California, 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889 (1947), is particularly appropriate here.
 
 
 1
 'The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot be their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act.'
 
 
 2
 The rule that estoppel may not be invoked against the Government in cases involving public lands is set out in the excellent opinion of Judge Barnes in Beaver v. United States, 350 F.2d 4 (9th Cir. 1965).
 
 
 3
 Even if the doctrine of estoppel were available against the Government, it could not be applied here because there were no misleading statements or conduct that would give rise to an estoppel between private parties. Here the Government is not asking the Cappaerts to stop pumping but only to limit pumping to the level at which the pupfish can survive.
 
 
 4
 The State of Nevada, as intervenor, has asserted additional grounds for reversal.
 
 
 5
 Nevada contends that the federal government is bound by state water laws and that the rights which the Government asserts here were not acquired in conformity with state law. Under the Nevada law in effect in 1952, water rights could only be prefected by the issuance of a permit by the State Engineer.
 
 
 6
 The Government asserts that its rights were established by the implied reservation in the Presidential Proclamation of 1952 and that the United States is not bound by state water laws when it reserves land from the public domain. We agree.
 
 
 7
 The Desert Land Act of 1877, supra, severed soil and water rights on 'public lands' and provided that such water rights were to be acquired in the manner provided by the law of the state of location. California-Oregon Power Co. v. Beaver Cement Co., supra at 162, 55 S.Ct. 725. But state water laws do not apply to 'reservations'-- lands withdrawn from the public domain. Federal Power Commission v. Oregon, 349 U.S. 435, 444, 448, 75 S.Ct. 832, 99 L.Ed. 1215 (1955).
 
 
 8
 We hold that the Proclamation of 1952, which withdrew the Devil's Hole pool from the public domain, implicitly reserved the waters necessary to sustain the pupfish and legally established the Government's rights as against any future appropriation.
 
 
 9
 Nevada next contends that the District Court did not have jurisdiction to adjudicate the water rights in this case. Nevada argues that the Government must exhaust state procedures for determining water rights before going to a federal court. There is no merit in this contention.
 
 
 10
 Nevada relies on the so-called McCarran Amendment, 43 U.S.C. 666 (1964).[8] That statute waives the sovereign immunity of the United States in certain cases involving adjudication of water rights. The waiver enables states to adjudicate competing claims for water rights in certain cases in which the United States is one of the claimants.
 
 
 11
 The McCarran Amendment was enacted to waive sovereign immunity when the United States is a defendant in a state or federal action so that water rights may be fairly and fully adjudicated. Congress did not intend to limit the forums available to the United States as a plaintiff by narrowing federal court jurisdiction. In United States v. Nevada et al., 412 U.S. 534, 538, 93 S.Ct. 2763, 37 L.Ed.2d 132 (1973), the Supreme Court noted that the District Court had jurisdiction to hear a case brought by the United States involving competing claims to water rights.
 
 
 12
 Nevada also contends that even if the District Court had concurrent jurisdiction with the state courts, the doctrine of res judicata bars the Government from collaterally attacking the decision of a state administrative body-- here the State Engineer.
 
 
 13
 In April, 1970, the Cappaerts applied to the State Engineer for permits to use groundwater from several wells.[9] The United States was not a party to these proceedings, nor was it ever served with process. Nevertheless, employees of the National Park Service learned of the applications through a public notice. A field solicitor for the National Park Service protested the applications because extracting groundwater would lower the water level in the Devil's Hole pool and might endanger the pupfish.
 
 
 14
 At the hearing held before the State Engineer in December, 1970, the solicitor explained the geological and hydrological bases for the Government's concern. He asked that the Cappaerts' applications be denied or postponed pending further scientific studies. The solicitor did not raise the jurisdictional issue or any of the legal issues which the United States had the right to assert.
 
 
 15
 In August, 1971, the Government filed this action in District Court to enjoin the Cappaerts from infringing on the Government's water rights at Devil's Hole. Nevada contends that the State Engineer's decision is res judicata and this action is therefore barred. We disagree.
 
 
 16
 The State Engineer did not have the authority to adjudicate the water rights of the United States because the United States did not waive its sovereign immunity.
 
 
 17
 Nevada's reliance here on the McCarran Amendment[10] is misplaced. The McCarran Amendment was enacted to waive the sovereign immunity of the United States in cases in which the presence of the United States as a party was necessary to the full and fair adjudication of competing claims to water rights. The Supreme Court in Dugan v. Rank, 372 U.S. 609, 618, 83 S.Ct. 999, 1005, 10 L.Ed.2d 15 (1963), interpreted that statute to waive sovereign immunity only in '. . . a case involving a general adjudication of 'all the rights of various owners on a given stream,' . . ..' See State of California v. Rank, 293 F.2d 340, 346 (9th Cir. 1961). The Senate Report on the bill which became the McCarran Amendment shows the type of adjudication which was contemplated by Congress. The Report contained the following excerpt from Pacific Live Stock Co. v. Lewis, 241 U.S. 440, 447, 36 S.Ct. 637, 641, 60 L.Ed. 1084 (1916):
 
 
 18
 '. . . All claimants are required to appear and prove their claims; no one can refuse without forfeiting his claim, and all have the same relation to the rpoceeding. It is intended to be universal and to result in a complete ascertainment of all existing rights . . ..' S.Rep.No.755, 82d Cong., 1st Sess. 5 (1951).
 
 
 19
 The proceeding before the State Engineer of Nevada was not a 'general adjudication'. The United States was not required to appear and prove its water rights to prevent forfeiture of its claims; the water rights of the United States were not in issue. The United States appeared only to explain the factual basis on which it opposed the Cappaerts' applications.
 
 
 20
 Furthermore, the McCarran Amendment waives sovereign immunity only in cases in which the United States is a defendant and has been served with process. The United States was neither a defendant nor served with process in the proceedings before the State Engineer.
 
 
 21
 Even if the United States had waived its sovereign immunity, we are not bound to give res judicata effect to the decision of an administrative body in a case of this kind. As the court said in Grose v. Cohen, 406 F.2d 823, 824 (4th Cir. 1969):
 
 
 22
 'Res judicata of administrative decisions is not encrusted with the rigid finality that characterizes the precept in judicial proceedings . . .. Application of the doctrine often serves a useful purpose in preventing relitigation of issues administratively determined, . . . but practical reasons may exist for refusing to apply it, e.g., United States v. Stone & Downer Co., 274 U.S. 225, (47 S.Ct. 616, 71 L.Ed. 1013) (1927). And in any event, when traditional concepts of res judicata do not work well, they should be relaxed or qualified to prevent injustice. 2 Davis, Administrative Law, 18.03 (1958).'
 
 
 23
 Although the State Engineer may have expertise in the administration of Nevada's water laws, there is no evidence that he is qualified to consider or decide the complex issues of federal law involved in this case. The State Engineer's decision is not entitled to res judicata effect in this action.
 
 
 24
 We affirm the decision of the District Court. The District Court held the water level should be maintained at 3.0 feet below the copper washer in order to preserve the pupfish in the Devil's Hole pool. Pending this appeal, we permitted the Cappaerts to pump as long as the water level did not go below 3.3 feet. We remand this case to the District Court to determine whether, on the facts developed during the pendency of this appeal, the lower water level may be adequate to preserve the pupfish.
 
 
 25
 We direct the District Court to retain continuing jurisdiction so that it may promptly act if a change in water level is required to preserve and protect the pupfish in the Devil's Hole pool.
 
 
 26
 Affirmed and remanded.
 
 
 
 *
 The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 In this opinion 'groundwater' will be used synonymously with 'underground water'
 
 
 [2]
 The Cappaerts pump water only from March to October. During the rest of the year the water level is higher
 
 
 [3]
 It was established before Winters that the Federal Government has the power to reserve waters which are needed for federal lands and to exempt those waters from appropriation under states laws. United States v. The Rio Grande Dam & Irrigation Co., 174 U.S. 690, 703, 706, 19 S.Ct. 770, 43 L.Ed. 1136 (1899); United States v. Winans, 198 U.S. 371, 383, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). In those cases, however, the Government had expressly dealt with water rights
 
 
 [4]
 It is intersting that Nevada administers its water laws so as to provide that rights to groundwater can be perfected just as readily as rights to surface water
 
 
 [5]
 Under the doctrine of prior appropriation, the first person to possess by beneficial use water for domestic purposes, mining, agriculture, or manufacturing has vested and accrued rights to the water as against any later appropriators. The central principle of the doctrine is beneficial use of water, not land ownership. Atchison v. Peterson, 87 U.S. 507, 22 L.Ed. 414 (1874); Powell, Real Property, Vol. 5, P734, page 442
 
 
 [6]
 N.R.S. 533.030. Appropriation for beneficial use
 '1. Subject to existing rights, all such water may be appropriated for beneficial use as provided in this chapter and not otherwise.'
 
 
 [7]
 N.R.S. 534.020
 'All underground waters within the boundaries of the state belong to the public, and, subject to all existing rights to the use thereof, are subject to appropriation for beneficial use only under the laws of this state relating to the appropriation and use of water and not otherwise.'
 
 
 [8]
 'Suits for adjudication of water rights-- Joinder of United States as defendant; costs
 (a) Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: Provided, That no judgment for costs shall be entered against the United States in any such suit.
 Service of summons
 (b) Summons or other process in any such suit shall be served upon the Attorney General or his designated representative.'
 
 
 [9]
 Sections 534.050 and 534.080 of the Nevada Revised Statutes both provide that rights to use groundwater must be obtained in compliance with Chapter 533. That chapter provides that a person who wishes to appropriate public water for his use must file an application with the State Engineer and must then publish notice of the application. N.R.S. 533.325 and 533.360. Interested persons may protest the application, and the application and protest may be considered at a hearing by the State Engineer. N.R.S. 533.365. The application may be refused if to grant it would be 'detrimental to the public welfare'. N.R.S. 533.370
 
 
 [10]
 See Footnote 8, supra