No. 01-415

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 280

THE CONFEDERATED SALISH AND KOOTENAI TRIBES
OF THE FLATHEAD RESERVATION, STATE OF MONTANA,

Petitioners,

v.

JACK STULTS, Administrator, Water Resources Division,
Montana Department of Natural Resources and Conservation;
BUD CLINCH, Director, Montana Department of Natural Resources
Conservation; MONTANA DEPARTMENT OF NATURAL
RESOURCES AND CONSERVATION; DONALD D. MacINTYRE,
Special Assistant Attorney General, Montana Department of Natural
Resources and Conservation; REGINALD C. LANG,

Respondents.



FILED

DEC – 6 2002

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

ORIGINAL PROCEEDING

COUNSEL OF RECORD:

For Petitioners:

James H. Goetz (argued), Goetz, Gallik, Baldwin & Dolan, PC, Bozeman, Montana

John B. Carter (argued), Daniel F. Decker, Confederated Salish and Kootenai Tribes, Pablo, Montana

For Respondents:

Greg L. Ingraham (argued), Ingraham Law Firm, Ronan, Montana

Harley R. Harris (argued), Gary L. Davis, Candace Payne, Special Assistant Attorneys General, Luxan & Murfitt, PLLP, Helena, Montana

Hon. Mike McGrath, Attorney General; Candace West (argued), Assistant Attorney General, Helena, Montana

Argued and Submitted: December 11, 2001
Decided: December 6, 2002

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 The Petitioners, the Confederated Salish and Kootenai Tribes of the Flathead Reservation, have petitioned this Court to exercise original jurisdiction and enjoin the issuance of a Beneficial Water Use permit to Reginald C. Lang. The Tribes further request that we find the Department of Natural Resources and Conservation (DNRC) and the individual Respondents, Jack Stults, Bud Clinch and Donald MacIntyre, in contempt of a prior order of this Court. We permanently vacate the Final Order issued in *In the Matter of the Application for Beneficial Water Use Permit* 76-L109371 *by Reginald C. Lang* but decline to decide whether Respondents are in contempt of court.

¶2 The Tribes' Petition raises the following issues:

¶3 1. Is this an appropriate case in which to exercise original jurisdiction?

¶4 2. Should the Final Order authorizing issuance of a Beneficial Water Use permit to Lang be dissolved?

¶5 3. Should Respondents Stults, Clinch, the DNRC, and MacIntyre be held in contempt?

FACTUAL AND PROCEDURAL BACKGROUND

¶6 Respondent Reginald C. Lang purchased real property on the Flathead Reservation a few miles north of Hot Springs, Montana, where he intended to commercially bottle water. Lang applied for a Beneficial Water Use Permit on September 21, 1999. On January 10, 2000, the DNRC notified Lang that two objections had been filed. One of those was filed by the Confederated Salish and Kootenai Tribes, who objected on the basis that the DNRC

2

did not have the jurisdiction to issue water use permits on the Reservation.

¶7 The DNRC held a hearing concerning Lang's application on September 7, 2000. The Tribes did not participate in that hearing. On May 8, 2001, Hearings Officer Charles Brasen issued the DNRC's Proposal for Decision. The Hearings Officer proposed that the DNRC grant Lang's permit application based on his conclusion that although our holding in *Confederated Salish and Kootenai Tribes v. Clinch*, 1999 MT 342, 297 Mont. 448, 992 P.2d 244, enjoined the DNRC from issuing permits on the Reservation until the Tribes' reserved water rights have been quantified, that holding did not apply to "a ground water source that is not hydrologically connected to the surface source." As a result, the Hearings Officer concluded that Lang met the statutory requirements for issuance of a beneficial water use permit codified at § 85-2-311, MCA. Nevertheless, the Hearings Officer concluded that the DNRC should not enter a final order in the matter until this Court dissolved or modified the holding of *Clinch*.

¶8 On or about May 11, 2001, the DNRC filed a "motion" with the *Clinch* caption in which it asked this Court, pursuant to Rule 22, M.R.App.P., to dissolve or modify our Order in *Clinch*. The DNRC contended that the injunctive relief granted in *Clinch* was overbroad because there is no precedent for the proposition that the Tribes have a reserved water right in groundwater. Further, the DNRC noted that Lang's application had been processed and that after a hearing, the Hearings Officer proposed that a permit be issued. The DNRC asked that the facts pertinent to the Lang application be reviewed pursuant to Rule 22, M.R.App.P., and that we modify our prior order to specify that it does not apply to groundwater. Finally,

3

the attached affidavit of Administrator Jack Stults opined that the *Clinch* order enjoined only "the issuance" of beneficial use permits within the Flathead Reservation "but did not enjoin the processing of applications."

¶9     On May 31, 2001, this Court denied the DNRC's motion. We held that the motion procedure utilized by the DNRC was not appropriate and that resolution of DNRC's request that we revisit the Lang application was dependent on facts this Court was ill-equipped to develop.

¶10     Nevertheless, Stults issued a Final Order on Lang's application on June 7, 2001. The Final Order granted Lang's application by adopting the Findings of Fact and Conclusions of Law proposed by the hearing examiners with the exception of Conclusion of Law No. 2, which was revised to state as follows:

> The Department made application to the Montana Supreme Court to dissolve or modify its injunction as it applies to the above-styled application. By order of May 31, 2001, the application was denied. However, the Supreme Court stated that the relief sought by the Department is dependent on facts which the Supreme Court is not well equipped to develop and that the issue would be more appropriately considered following a fully developed factual record. A factual record having been developed in this matter and to accord the parties their due process rights to appeal on the record, the final order in this matter may be entered.

¶11     The Tribes filed a Petition for Writ of Supervisory Control with this Court on June 18, 2001. The Tribes first requested that we suspend the Final Order authorizing issuance of a new water permit to Lang, and second that this Court find Respondents in contempt of court. On June 19, 2001, we stayed the DNRC's Final Order on Lang's application pending further order of this Court.

4

¶12 On July 11, 2001, Stults, Clinch and the DNRC moved to dismiss the contempt claim, as did Respondents MacIntyre, Hall, and Robinson on July 12, 2001. The Tribes later amended their Petition by dismissing Hall and Robinson as Respondents.

¶13 On August 1, 2001, the Respondents moved this Court to require mediation.

¶14 On August 14, 2001, we entered an Order which took the motion to dismiss, the contempt charge, and the motion to compel arbitration under advisement. We then deferred all pending motions until we addressed the merits of the Tribes' petition for original jurisdiction.

¶15 The DNRC and Lang then responded to the Petition and we held oral argument on November 13, 2001.

## DISCUSSION

## ISSUE 1

¶16 Is this an appropriate case in which to exercise original jurisdiction?

¶17 Exercise of original jurisdiction is provided for by Article VII, Section 2(1) of the Montana Constitution. The exercise of original jurisdiction is limited to those cases where the applicant demonstrates that:

> (1) constitutional issues of major statewide importance are involved;
> (2) the questions involved are purely legal questions of statutory or constitutional construction, and;
> (3) urgency and emergency factors exist which make the normal appeal process inadequate.

*Stuart v. Dept. of Social and Rehab Services* (1991), 247 Mont. 433, 439, 807 P.2d 710, 713.

¶18 The DNRC argues that the Tribes cannot satisfy the three-pronged test for original

jurisdiction because factual issues remain that could be addressed through the normal trial and appeal process. Moreover, the DNRC contends that the issues raised by the current Petition are different than the issues raised in *Clinch* because no administrative proceedings were pending in that case. Lang additionally argues that the Tribes have failed to show that their reserved water rights would be affected and therefore cannot demonstrate that irreparable harm would result from the permit he was issued.

¶19 We conclude that this is an appropriate case in which to exercise original jurisdiction. Our reasons for accepting original jurisdiction in this matter are identical to the reasons for exercising original jurisdiction in *Clinch*. *See Clinch*, ¶ 9. The Petition implicates Article IX, Section 3(1) of the Montana Constitution; tribal water rights are of statewide importance; the decisive issue in this case is purely legal or constitutional; and the normal litigation process is inadequate.

¶20 Those issues of fact which precluded consideration of the DNRC's May 11, 2001, motion to dissolve or modify our order in *Clinch* (i.e., whether groundwater is necessary for the purpose for which the reservation was established) are not presented in this case and, for reasons which should have been apparent from our prior decisions, cannot be decided other than by negotiation or general water rights adjudication. In contrast, the issues raised here are purely legal (i.e., whether permits of any kind can be issued prior to quantification of the Tribes' water rights). The normal litigation process is inadequate because Stults has already issued the Final Order authorizing a new water permit for Lang to the potential detriment of the Tribes' unquantified reserved water rights. Furthermore, as repeatedly pointed out by this

6

and other courts, the Tribes need not participate in piecemeal agency proceedings to defend their reserved water rights.

ISSUE 2

¶21 Should the Final Order authorizing issuance of a Beneficial Water Use permit to Lang be vacated?

¶22 The Tribes urge us to give effect to our decisions in *In the Matter of the Application for Beneficial Water Use Permit Nos. 66459-76L, Ciotti; 64988-G76L, Starner; and Application for Change of Appropriation Water Right No. G15152-S76L, Pope* (1996), 278 Mont. 50, 923 P.2d 1073, and *Clinch* and vacate the Final Order which approved Lang's water permit application. As the following discussion demonstrates, the legal issues addressed and resolved in *Ciotti* and *Clinch* were the same as the issues raised here. Accordingly, we find our analyses in *Ciotti* and *Clinch* dispositive.

¶23 Our 1996 decision in *Ciotti* held that the State may not issue new water permits on the Flathead Reservation until the Tribes' prior and preeminent federally reserved water rights have been quantified, either by a general *inter sese* water rights adjudication or by compact negotiations with the Montana Reserved Water Rights Compact Commission pursuant to § 85-2-702, MCA. *Ciotti*, 278 Mont. at 61, 923 P.2d at 1080.

¶24 In *Clinch*, we revisited *Ciotti* in light of S.B. 97, which amended § 85-2-311, MCA (1997), by eliminating the requirement in subparagraph (1)(e) that an applicant for a water use permit prove that the proposed use will not interfere unreasonably with the use for which water has been reserved. Instead, the Legislature inserted a requirement that the applicant

7

prove water is "legally available." However, those terms were not defined in the Water Use Act other than in a circular three-part test which requires consideration of "legal demands." *See* § 85-2-311(1)(A)-(C), MCA (1999). We held, similar to our holding in *Ciotti*, that the DNRC cannot determine whether water is legally available on the Flathead Indian Reservation because there is no way to determine whether issuance of permits would affect the Tribes' existing water rights until those rights have been quantified. *Clinch,* ¶ 28.

¶25 Despite the seemingly clear mandate of *Ciotti* and *Clinch*, the Hearings Officer's Proposal for Decision reasoned that the Tribes' federally reserved water right does not encompass groundwater. Then, despite our order denying the DNRC's motion to dissolve or modify *Clinch* as it related to Lang's application, Stults issued the Final Order granting Lang's application. It is that action which is the subject of the present Petition.

¶26 In support of their Petition, the Tribes contend that the Final Order is illegal pursuant to § 85-2-311, MCA, our decisions in *Ciotti* and *Clinch*, and our Order of May 31, 2001. The Tribes further contend that as a sovereign nation they should not be required to defend their water rights in piecemeal proceedings before a hostile forum.

¶27 The DNRC and Lang respond that the DNRC developed a factual record in response to our May 31, 2001, Order and that the Findings of the Hearings Officer, which were adopted in the Final Order, were supported by substantial evidence. Never mind that the factual record was developed without the Tribes' participation. The DNRC additionally argues that *Ciotti* should not be extended to this situation because the Tribes' rights to groundwater is legally uncertain.

8

¶28    We conclude that the Final Order should be vacated and that the DNRC cannot issue

beneficial water use permits for groundwater until the Tribes' federally reserved water rights

have been defined and quantified. In *Clinch,* we reviewed the relevant legal principles and

thoroughly explained the reasons for our holding in *Ciotti*:

> [In *Ciotti*], we were asked to decide whether the Department had authority
> to grant new water use permits on the Flathead Indian Reservation prior to
> settlement or adjudication of the Tribes' water rights. We noted that the
> requirements for issuance of water use permits were set forth at § 85-2-311(1),
> MCA, and that subsection (e) of that statute required that an applicant
> demonstrate that:
>
>> The proposed use will not interfere unreasonably with other planned uses
>> or developments for which a permit has been issued or for which water has
>> been reserved....
>
> * * * *

*Ciotti,* 278 Mont. at 55, 923 P.2d at 1076.

> We explained that there is a difference between State appropriated water
> rights and Indian reserved water rights and to illustrate, pointed out that:
>
>> In *State ex. rel. Greely v. Confederated Salish and Kootenai Tribes of
>> the Flathead Reservation* (1985), 219 Mont. 76, 89-90, 712 P.2d 754, 762,
>> we noted that:
>>
>>> State appropriative water rights and Indian reserved water rights differ
>>> in origin and definition. State-created water rights are defined and
>>> governed by state law. Indian reserved water rights are created or
>>> recognized by federal treaty, federal statutes or executive order and are
>>> governed by federal law.
>>>
>>> . . . .
>>>
>>> Appropriative rights are based on actual use. Appropriation for
>>> beneficial use is governed by state law. Reserved water rights are
>>> established by reference to the purposes of the reservation rather

9

than to actual, present use of the water. (Citations omitted.)

We also distinguished reserved rights on the basis that they need not be diverted from the stream when we observed that:

> The right to water reserved to preserve tribal hunting and fishing rights is unusual in that it is non-consumptive. A reserved right for hunting and fishing purposes "consists of the right to prevent other appropriators from depleting the stream waters below a protected level in any area where the non-consumptive rights applies." [*United States v.*] *Adair* [(9ᵗʰ Cir. 1983)], 723 F.2d [1394,] 1411, [*cert. denied*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984)].

The Supreme Court has also held that under the implied-reservation-of-water-rights doctrine, Indians are entitled to sufficient water "to develop, preserve, produce or sustain food and other resources of the reservation, to make it livable." *Arizona v. California* [(1963)], 373 U.S. [546,] 599-600, [83 S.Ct. 1468, 1497-98, 10 L.Ed.2d 542].

. . . .

The *Winters* Court held that reserved water on the Fort Belknap Reservation could be beneficially used for "acts of civilization" as well as for agricultural purposes. *Winters v.* [*United States* (1908)], 207 U.S. [564], 576 [28 S.Ct. 207, 211, 52 L.Ed. 340]. It may be that such "acts of civilization" will include consumptive uses for industrial purposes. We have not found decisive federal cases on the extent of Indian water rights for uses classed as "acts of civilization."

It is clear, however, that Indian reserved water rights may include future uses. *Arizona v. California*, 373 U.S. at 600-01, 83 S.Ct. at 1498; *United States v. Ahtanum Irrigation District* (9ᵗʰ Cir. 1964), 330 F.2d 897, 914. Most reservations have used only a fraction of their reserved water. National Water Commission, Water Policies for the Future 51-61 (1973). However, reserved rights may reflect future need as well as present use. For example, the "practically irrigable acreage" standard applies to future irrigation or reservation land, not present irrigation practices and current consumptive uses.

We explained that it is undisputed that the Tribes possess reserved water rights

10

which the Tribes were then attempting to quantify through negotiations with the State of Montana pursuant to §§ 85-2-701 through -705, MCA and that "[u]ntil the formal negotiations are resolved, however, the extent of the Tribes' reserved water rights remains unknown. Although it is likely that the Tribes' rights are pervasive, reserved water rights are difficult to quantify." *See Ciotti,* 278 Mont. at 59, 923 P.2d at 1079.

*Clinch,* 297 Mont. at 451-53, 992 P.2d at 247-48.

¶29 The same legal principles apply to the Tribes' Petition in this case. Neither *Ciotti* nor *Clinch* excluded groundwater from our holding that an applicant for a water use permit cannot prove that the requested use will not unreasonably interfere with the Tribes' reserved water rights because those rights have never been quantified. In fact, the dissent to our decision in *Clinch* made clear that groundwater was implicated by our decision. *Clinch,* 297 Mont. at 457, 992 P.2d at 250-51 (Rodeghiero, dissenting).

¶30 Furthermore, the only federal authority which has been cited to this Court by either party supports the conclusion that there is no distinction between surface water and groundwater for purposes of determining what water rights are reserved because those rights are necessary to the purpose of an Indian reservation. In *Tweedy v. Texas Co.* (D.Mont. 1968), 286 F.Supp 383, 385, the U.S. District Court for the State of Montana stated as follows:

> When the Blackfeet Indian Reservation was created, the waters of the reservation were reserved for the benefit of the reservation lands. *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). The *Winters* case dealt only with the surface water, but the same implications which led the Supreme Court to hold that surface waters had been reserved would apply to underground waters as well. The land was arid–water would make it more useful, and whether the waters were found on the surface of the land or under it should make no difference.

11

¶31    In *United States v. Cappaert* (9th Cir. 1974), 508 F.2d 313, 317, the Ninth Circuit Court of Appeals likewise cited *Winters* for the proposition that so much water is reserved as is necessary to accomplish the purpose of a reservation and went on to conclude that the water reserved is not limited to surface water but may include underground water.

¶32    In *Cappaert v. United States* (1976), 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523, the Supreme Court concluded that the groundwater at issue was physically interrelated with surface water before concluding that the federal government had reserved an interest in the groundwater. However, the Court then plainly stated that:

> Thus, since the implied reservation of water rights doctrine is based on the necessity of water for the purpose of the federal reservation, we hold that the United States can protect its water from subsequent diversion, whether the diversion is of surface or groundwater.

*Cappaert*, 426 U.S. at 143, 96 S.Ct. at 2071.

¶33    Finally, in the only state court decision cited by either party which includes any analysis of the issue, the Arizona Supreme Court in *In re Gila River System and Source* (Ariz. 1999), 989 P.2d 739, 747, held that:

> In summary, the cases we have cited lead us to conclude that if the United States implicitly intended, when it established reservations, to reserve sufficient unappropriated water to meet the reservations' needs, it must have intended that reservation of water to come from whatever particular sources each reservation had at hand. The significant question for the purpose of the reserved rights doctrine is not whether the water runs above or below the ground but whether it is necessary to accomplish the purpose of the reservation.

¶34    For those reasons, the Arizona Supreme Court held that the federal reserved water rights doctrine applies to not only surface but to groundwater. However, that Court did not

12

decide, and we do not decide, whether the groundwater at issue was necessary to accomplish the purpose of the reservation. As stated by the Arizona Supreme Court:

> To determine the purpose of a reservation and to determine the waters necessary to accomplish that purpose are inevitably fact-intensive inquiries that must be made on a reservation-by-reservation basis. *See United States v. New Mexico*, 438 U.S. at 700, 98 S.Ct. 3012.

*Gila River System*, 989 P.2d at 748.

¶35　We see no reason to limit the scope of our prior holdings by excluding groundwater from the Tribes' federally reserved water rights in this case. The Legislature has created the Montana Reserved Water Rights Compact Commission, a body charged with the difficult task of quantifying and negotiating Indian reserved water rights. Quantifying the amount of groundwater available to the Tribes is simply another component of that inquiry. If it cannot be done to the parties' satisfaction, then comprehensive water rights adjudication is the proper forum in which to make that determination.

¶36　There is nothing unclear about the scope of our decision in *Clinch*:

> Accordingly, we order that the Department not issue further water use permits on the Flathead Reservation until the Tribes' rights have been quantified.

*Clinch*, ¶ 28.

¶37　We cannot say it more clearly: the DNRC cannot process or issue beneficial water use permits on the Flathead Reservation until such time as the prior pre-eminent reserved water rights of the Tribes have been quantified.

¶38　We further conclude that the Tribes should not be required to defend their water rights by participating in the DNRC hearings process. The Tribes, as a sovereign nation, generally

13

enjoy sovereign immunity from proceedings in state courts. However, the McCarran Amendment, enacted by Congress in 1952, expressly permits the joinder of the federal government in state suits involving the adjudication of water rights. *See* 43 U.S.C. § 666. The stated purpose of the McCarran Amendment is to prevent piecemeal water rights adjudications by requiring determination of all water rights in a given river system in a single proceeding. *See United States v. District Court In and For Eagle County* (1971), 401 U.S. 520, 525, 91 S.Ct. 998, 1002, 28 L.Ed.2d 278. In *Colorado River Water Conservation Dist. v. United States* (1976), 424 U.S. 800, 809-810, 96 S.Ct. 1236, 1242, 47 L.Ed.2d 483, the United States Supreme Court extended the McCarran Amendment's waiver of federal sovereign immunity to state court adjudications of Indian reserved water rights. That waiver, however, is limited to comprehensive adjudications:

> The McCarran Amendment, as interpreted in *Colorado River*, allows and encourages state courts to undertake the task of quantifying Indian water rights in the course of *comprehensive water adjudications*. [Emphasis added.]

*Arizona v. San Carlos Apache Tribe* (1983), 463 U.S. 545, 569, 103 S.Ct. 3201, 3215, 77 L.Ed.2d 837.

¶39 Two statutory methods for comprehensively adjudicating Indian reserved water rights already exist – a general *inter sese* adjudication or negotiations with Montana Reserved Water Rights Compact Commission. The DNRC's case by case analysis of individual water rights applications is not a comprehensive adjudication. Therefore, the Tribes did not and were not required to participate in agency hearings concerning Lang's application. Consequently, the DNRC's attempt to circumvent our May 31, 2001, Order on the grounds

14

that the agency developed an adequate factual record is not well taken, nor is their motion to compel mediation. For that reason, the motion to compel mediation is denied.

ISSUE 3

¶40 Should Respondents Stults, Clinch, the DNRC, and MacIntyre be held in contempt?

¶41 The Tribes suggest that Stults, Clinch, the DNRC, and the DNRC's attorney Don MacIntyre, are in contempt for willful disregard of our *Clinch* injunction and of our May 31, 2001, order. Section 3-1-501, MCA, defines contempt as disobedience of any lawful judgment of the Court. The Tribes request a monetary sanction and an order requiring the State to pay the Tribes' attorney fees.

¶42 The Respondents move to dismiss the Tribes' petition to have them held in contempt. First, Respondents contend that that part of the petition does not meet the three-prong test for exercising original jurisdiction, especially since the contempt issue presents issues of fact which cannot be decided in this Court.

¶43 The Tribes contend that the issue presented by the contempt claim is a simple one. They point out that in *Clinch*, this Court enjoined the DNRC from issuing new water use permits on the reservation until the Tribes' existing water rights are quantified. In spite of that clear injunction, the Respondents proceeded to issue a water permit to Lang. The Tribes contend that the only factual issue is to determine which parties are responsible and that that can be determined at a show-cause hearing before this Court.

¶44 While we disagree with the Respondents' contention that this Court would not typically have jurisdiction to determine that a party is in contempt for willful disregard of a

15

judgment entered by this Court, we do agree with the DNRC that the Petition before us presents factual issues better resolved in a district court. For example, Stults and Clinch claim that they did not make the decision to proceed with issuance of the permits but that it was made by then Governor Marc Racicot. They also claim that they acted on advice of counsel and that this Court's decision in *Clinch* did not clearly and unambiguously prohibit new permits for groundwater. MacIntyre contends that he gave reasonable advice to the other Respondents based on his interpretation of our prior decisions. However, presumably based on attorney-client privilege, he does not specify the nature of that advice. The Tribes' attorney is not in a position to know the specific nature of that advice and neither are we.

¶45 While we disagree with the Respondents' contention that there was anything ambiguous or unclear about the *Clinch* decision, we do agree that there are factual issues relevant to the contempt issue and what, if any, sanctions are appropriate as the result of any contempt that may have occurred. Therefore, the Respondents' motion to dismiss the petition to have Respondents held in contempt of this Court's judgment in *Clinch* and our May 31, 2001, order is granted without prejudice. The matter should more properly be raised in the trial court where venue is established so that evidence can be presented and factual issues resolved.

¶46 Therefore, for the reasons previously stated, we hold, as we did in *Ciotti* and in *Clinch* that the DNRC cannot determine whether water is legally available on the Flathead Indian Reservation, whether surface water or groundwater, because the DNRC cannot determine whether the issuance of permits would affect existing water rights until the Tribes' water

16

rights are defined and quantified by compact negotiation pursuant to § 85-2-702, MCA, or by general *inter sese* water rights adjudication. Accordingly, we once again order that the DNRC not issue further water use permits on the Flathead Reservation until the Tribes' rights have been quantified. This decision and judgment pertains to all water use permits.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices

_____
District Court Judge Marc G. Buyske
sitting in for Justice Leaphart

17

Justice Jim Rice, concurring in part and dissenting in part.

¶47 For the reasons expressed herein, I concur with the Court's exercise of original jurisdiction, concur with the conclusion that groundwater is included within the Tribes' reserved rights, dissent from the enjoinment of the issuance of the Lang permit, and would decide the contempt issue by holding that the charged individuals have not acted contemptibly.

¶48 The use of water resources is undeniably linked to civilization's advancement and indeed, its survival. However, for the many people who must live and survive on the Flathead Reservation in Montana, for whom this issue is critical, this Court has brought adjudication of water rights to grinding halt. More extremely, it has even barred the issuance of provisional water use permits. It has rebuffed the Legislature's attempt to resolve water questions in a manner that respects all water rights. It has barred state officials from discharging their constitutionally-mandated duty to address water issues for the benefit of Montana citizens. Its successive decisions in this matter, which are legally artificial and disassociated with any practical reality, have created for our citizens a monumental impasse. It is as if the Court believes that water has simply stopped flowing, and government can suspend regulating, and people can postpone pursuing life's necessities, until all water is either adjudicated or negotiated in the manner it deems appropriate.

¶49 The state officials named here have attempted, and must continue to attempt, as is their duty, to administer the use of water in this state. They have attempted to do so in a

18

manner that does not violate this Court's decisions, and in accordance with the directives of the Legislature, which has also attempted to respond in accordance with this Court's decisions. However, the officials' actions have alarmed the Tribes, who understandably draw the conclusion from this Court's decisions that water adjudication and permitting must cease altogether, and therefore read malicious motives into the officials' actions, causing them to make a remarkable contempt charge in a petition for original jurisdiction. That has been followed by a series of accusations and counter-accusations between the parties. Extraordinarily, Respondent attorneys have been relieved of their duties in this matter and have been silenced in regard to issues with which they have been intimately involved for many years, depriving this Court of their expertise in conducting its review. The State has been forced to engage new counsel. How has this all come about? Who is at fault? The answers to these questions are really quite simple. The crisis before us today, as is painfully obvious, is the end result of none other than the decisions issued by this Court. *We have met the enemy, and it is us.*

¶50    I concur with the Court's exercise of original jurisdiction herein. I agree that the Tribes' reserved water rights are of statewide importance. To the consideration of this requirement for the exercise of original jurisdiction, I would add that the Tribes' status as a sovereign nation carries with it a presumption that legal issues which broadly affect the people, resources or general welfare of the reservation are vital to the state as a whole, have statewide impact, and are particularly suitable for the exercise of original jurisdiction.

19

Further, the exercise of original jurisdiction is compelled, and I would so grant, in order to resolve the intergovernmental stalemate between State and Tribes over the use of water that has arisen because of the decisions of this Court.

¶51 The Court's decision in *Ciotti* was based on a statutory interpretation of the Water Use Act that was, at least, plausible, and to which I will defer, although clearly subject to debate. *See Ciotti*, 278 Mont. at 70, 923 P.2d at 1085 (Turnage, C.J., dissenting.) What was alarming about the *Ciotti* decision was the result that the Court's statutory interpretation required: "a shutdown of the water permitting process in Montana." *Ciotti*, 278 Mont. at 70, 923 P.2d at 1085 (Turnage, C.J., dissenting).

¶52 Addressing this obvious calamity, the Legislature immediately responded to *Ciotti* by enacting S.B. 97, therein revising the statute which the Court said had mandated its decision. The Legislature removed disputed paragraph (1)(e) of § 85-2-311, MCA, which had allowed the Department to make a finding, after receiving evidence, that unappropriated water existed which was in excess of Tribal rights. The *Ciotti* Court had interpreted the provision to require proof that a proposed use would not interfere with Tribal rights, but because the Department's procedure did not adequately account for Tribal rights, this burden of proof could not be met until the Tribes' rights had been quantified. Thus, in response, the Legislature clarified its intention that provisional water permitting should continue pending finalization of the adjudication process, deleted the concept of "unappropriated water," and created a broadly inclusive process to allow the issuance of provisional water permits if the

applicant could establish that water was both physically and legally available. The Legislature, consistent with the constitutional mandate to protect all existing rights, included Tribal rights within the definition of existing rights. In enacting these provisions, the Legislature fulfilled its constitutional duty to protect all water rights within the state while at the same time fulfilling its undisputed duty to the welfare of all Montanans to administer water resources for beneficial purposes.

¶53 The enactment of S.B. 97 was a legitimate, and in my view, successful effort to cure the very problems in the statutes which the *Ciotti* Court had cited. This Court, however, was undaunted by the Legislature's effort to restore water permitting, and once again enjoined that process in *Clinch*. The basis for the Court's holding was that the process of establishing legal availability under S.B. 97 was impossible because (1) legal availability was insufficiently defined, and (2) as stated in *Ciotti*, Tribal rights were not the same as state water rights, could not be quantified in the same way, could not be protected, and therefore, all water permitting had to be enjoined.

¶54 *Clinch* was erroneously decided. First, the Court simplistically faulted S.B. 97 because "'[l]egally available' is not defined . . . other than in the circular three-part test." *Clinch*, ¶ 15. There is no precedent for the proposition that circuity in a statute's wording is fatal to its intended implementation, and if that were true, many other statutes would have suffered the same fate. The statute's definition of legal availability, which required an analysis of all physical and legal demands, combined with its specific protection of reserved

21

rights, should have been found to be sufficient. Secondly, the Court offered what has become its tired and ill-founded mantra, which, reduced to its essence, is this: because reserved rights are different, they cannot be quantified. The Court apparently assumes that it possesses expertise in water rights necessary to make such a determination without a factual record, because it has never required a record to reach this conclusion. The statutes, and the regulators who administer the statutes, claim these various rights can be determined. Obviously, reserved rights are different from appropriated rights; but I will not be so bold as to presume that this difference precludes a proper determination of those rights until I have had the opportunity to review evidence on the issue. Indeed, the Court in *Clinch* was "in effect, entering a permanent injunction without holding a factual hearing." *Clinch*, ¶ 29 (Rodeghiero, J., dissenting). Consequently, the holding in *Clinch* defied reality: "The practical consequences of the majority's decision will be significant and will deprive some Montana citizens of one of life's basic necessities, the use of water." *Clinch*, ¶ 33 (Rodeghiero, J., dissenting). On the basis of a proper statute, with its emphasis on preserving all constitutionally protected rights, including Tribal rights, the Court in *Clinch* should have allowed the Department to proceed. Its failure to do so set the stage for the conflict before us today.

¶55 So, once again we find a similar question before the Court, this time specifically addressing groundwater. Given the precedent presented by the Tribes on the issue, I concur with the Court's conclusion that groundwater is included within the Tribes' reserved water

claims. But that issue is of small consequence here. The larger issue is that the Court is attempting to dam up the entire process until it gets the result it wants. The Court is fooling itself if it believes that this decision has plugged the final leak in the legal dike. Water will simply not stop flowing, and Montanans will simply not stop needing it. The demands of humanity will bring the issue back.

¶56 I would not hold the officials involved in this matter in contempt for attempting to do their statutory and constitutional duty in a manner that was, arguably, consistent with this Court's prior decisions. I would expect nothing less from creative officials and zealous lawyers who were required to balance duty and precedent.

¶57 I would decline to enjoin the issuance of the Lang permit. Doing so would bring to the forefront a critical issue, long dormant, regarding jurisdiction. The Tribes have reserved this issue for federal review. The federal court system is the most appropriate forum for resolution, and should have been addressed long ago by the federal courts. In this regard, I agree with the following portion of Justice Leaphart's concurring opinion in *Ciotti*:

> The federal courts, however, have failed to reckon with the fact that the federal question (whether the tribes are constitutionally exempt from the Montana Water Use Act) presents a threshold question of jurisdiction; i.e., whether the state of Montana has any jurisdiction to apply its Water Use Act in the first instance. That fundamental question of state jurisdiction must be addressed first. . . . It is the state court which should be awaiting resolution of the jurisdictional question in federal court, not vice versa.

*Ciotti*, 278 Mont. at 65, n.1, 923 P.2d at 1082, n.1 (Leaphart, J., concurring). The federal courts have placed us in a difficult position, giving us enough rope to hang ourselves and

23

thereby contributing to this mess. Their help in getting us back out would be appreciated. The Tribes should not be allowed to continue to "run with the hare and hold with the hounds" on this issue. *Ciotti*, 278 Mont. at 66, 923 P.2d at 1083 (Leaphart, J., concurring).

¶58   Understandably, the Tribes would be concerned about the issuance of a permit, even a provisional one, that could potentially impose upon their rights. However, they would not be without various remedies, only one of which is the federal courts. The same cannot be said for Mr. Lang. Despite its professed concern over the provision of remedies, the Court has afforded him, and the many others like him who live on the reservation and need to use water, no remedy whatsoever. Despite statutes providing for the deliberate consideration of Lang's application and all other water rights that may be affected thereby, he and many other Montanans have been deprived, by this Court, of the opportunity to proceed in any manner. That is simply regrettable.

_____
                          Justice

Chief Justice Karla M. Gray, concurring in part and dissenting in part:

¶59   I agree with Justice Rice's concurring and dissenting opinion except for those portions discussing *Ciotti*.

_____
                     Chief Justice

24

Justice James C. Nelson specially concurs:

¶60   I concur in our Opinion. The rules of the trilogy of *State ex rel. Greely v. Confederated Salish and Kootenai Tribes* (1985), 219 Mont. 76, 712 P.2d 754, *Matter of Beneficial Water Use Permits* (1996), 278 Mont. 50, 923 P.2d 1073 (*Ciotti*); and *Confederated Salish & Kootenai Tribes v. Clinch*, 1999 MT 342, 297 Mont. 448, 992 P.2d 244, could not be more explicit: (a) The Montana Water Act, Title 85, Chapter 2, Montana Codes Annotated, is adequate to adjudicate Indian reserved water rights *only* to the extent that it recognizes, preserves and protects the fundamental legal differences between those rights and state appropriative rights; and (b) because of these fundamental legal differences the State may not process or issue beneficial water use permits on the Flathead Indian Reservation until Tribal water rights are quantified by a compact negotiation or by a general *inter sese* water rights adjudication.

¶61   These rules do not originate in rocket science: Indians own their reserved water rights; those rights are superior to state appropriative water rights; to date those reserved water rights have not been quantified as to amount or priority on the Flathead Indian Reservation; therefore, the State cannot grant to some third party a right to appropriate or use water that the State may not own. Furthermore, and like it or not, unless Congress or the United States Supreme Court changes the laws and federal jurisprudence in which this Court's trilogy of cases is grounded, no amount of statutory finessing or mental legerdemain is going to change these principles.

25

¶62 Indeed, the Department of Natural Resources and Conservation (DNRC) was put on notice that it had lost the permit-issuing battle as early as 1987, two years after *Greely*, when District Judge Gordon Bennett stated in *United States and Montana Power Co. v. Department of Natural Resources* (Don Brown) (D. Mont. June 15, 1987), No. 50612:

> [there is] only one way to determine if an unappropriated water right exists in a source of supply: decide how much water is available and how much of it has been appropriated. This obviously requires quantification of existing rights. There is, likewise, only one way to determine whether the water rights of prior appropriators will be adversely affected by additional appropriation. You must begin by determining what the water rights of the prior appropriators are. In either case, the need to determine existing water rights is inescapable . . . .

*Ciotti*, 278 Mont. at 62-63, 923 P.2d at 1081 (Nelson, J., concurring).

¶63 Unfortunately, Judge Bennett's legally correct, common-sense conclusion was either forgotten or ignored when, in 1990, DNRC's director determined that the agency had jurisdiction to regulate any "surplus water" on fee land even though Tribal reserved water rights had not been quantified. *Ciotti*, 278 Mont. at 53, 923 P.2d at 1075. The obviously glaring flaw in this conclusion is that, until Indian reserved water rights *are* quantified, no one knows whether there *is* any "surplus water" to regulate. For all any of us know, there may be no water left to appropriate on the Flathead Reservation, because the Indians own it all.

¶64 That the Legislature and Executive branches do not seem to get it, is disappointing, though not particularly surprising given what presumably is intense political pressure for non-Indian residential and commercial development on the Flathead Reservation. That,

26

however, does not justify the apologetics for those branches of government and the inflammatory rhetoric that characterizes the dissent--an opinion which, uncharacteristically for its author--is totally devoid of any reasoned legal analysis.

¶65 If, as the dissent states, this Court's trilogy of cases is "legally artificial," then the bench, bar and public are owed a *legal* explanation and analysis as to why that is so. If, as the dissent postures, there is a "crisis" and "calamity" of "monumental" proportions threatening "civilization's advancement and, indeed, its survival" on the Flathead Reservation, then, to be fair and intellectually honest, the dissent should be prepared to demonstrate unequivocally why this Court's prior opinions and instant decision are *legally* incorrect and how we have erred in applying the clearly established legal principles and the extensive body of federal law and jurisprudence that govern Indian reserved water rights-- principles, law and jurisprudence which, incidentally, this Court did not create, but is, nonetheless, constitutionally obligated to follow.

¶66 As written, the dissenting opinion will accomplish little more than provide sound bites for media; further strain relations between Indians and non-Indians and the Tribal and State governments; and provide fodder for those who, as a matter of course and in furtherance of their own misguided agendas, misrepresent to the public the law and this Court's opinions. More to the point, instead of railing against settled law, the dissent's frustration might be more profitably directed towards encouraging the State to put its unqualified efforts into quantifying the Tribe's reserved water rights using the legal tools provided, instead of

constantly trying to devise statutes to thwart those rights.

¶67     I concur in the Court's Opinion.

_____
                                    Justice