**UNITED STATES of America, Plaintiff-Appellant,**

**and**

**Spokane Tribe of Indians, Plaintiff-in-Intervention-Appellant,**

**v.**

**Barbara J. ANDERSON, James M. Anderson, et al., Defendants-Appellees.**

**Nos. 82–3597, 82–3625.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 8, 1983.

Decided July 10, 1984.

Martin W. Matzen, Jennele M. Morris, Attys., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Robert D. Dellwo, Spokane, Wash., Philip Wickstrand Dufford, Asst. Atty. Gen., Olympia, Wash., for defendants-appellees.

Before ANDERSON and FLETCHER, Circuit Judges, and EAST,[*] District Judge.

J. BLAINE ANDERSON, Circuit Judge:

The United States of America appeals a district court's determination that water rights appurtenant to certain reservation lands which passed out of trust status but which have subsequently been reacquired by the Spokane Tribe of Indians are entitled to a priority date as of the date of reacquisition by the Spokane Tribe. The Spokane Tribe also appeals, urging that the district court erred in holding that the State of Washington had regulatory jurisdiction over use of water by non-Indians on non-Indian land within the Spokane Indian Reservation. We affirm in part and reverse in part and remand for further proceedings in accordance with this decision.

## I. BACKGROUND

This action was originally filed in 1972 by the United States, acting on its own behalf and as trustee for the Spokane Tribe of Indians (Tribe), pursuant to 28 U.S.C. § 1345 (1976). The Tribe was permitted to intervene as a plaintiff. Defendants include the State of Washington, acting in its governmental and proprietary capacities, and all other persons or corporations who might have an interest in the disputed water rights which were the subject of the litigation.

---

[*] The Honorable William G. East, Senior United States District Judge, District of Oregon, sitting by designation.

The plaintiffs sought an adjudication of water rights in the Chamokane Basin, a hydrological system including Chamokane Creek, its tributaries and its ground water basin. The waters of the Chamokane Basin are not wholly within the Spokane Indian Reservation; Chamokane Creek originates north of the reservation and flows south along the eastern boundary. The creek leaves the reservation by discharging into the Spokane River which, in turn, joins with the Columbia River and flows into the Pacific Ocean. A water master for the Chamokane Basin has been appointed, according to the terms of a judgment entered on September 12, 1979, by the Honorable Marshall A. Neill, United States District Judge.

The Spokane Indian Reservation is not exclusively owned and resided upon by Indians. Non-Indian settlement has occurred there, encouraged by various federal programs authorizing allotment of reservation lands to individual Indians and opening excess land to homesteading by non-Indians. See, the General Allotment Act of 1887, 24 Stat. 388, codified at 25 U.S.C. § 331, *et seq.*, and the Act of May 29, 1908, 35 Stat. 458 (a "homestead" act). Some land opened for homesteading was never claimed and was subsequently restored to the Tribe by the Act of May 19, 1958, 72 Stat. 121. Some of the reservation land was homesteaded by non-Indians and some former Indian allotments passed into non-Indian ownership; much of this property has been reacquired by the Tribe and returned to trust status pursuant to the Act of June 10, 1968, 82 Stat. 174, codified as amended at 25 U.S.C. § 487. This vacillation of land ownership provides a framework for the instant controversy.

## II. DISCUSSION

Three general categories of reservation land are involved here: lands now owned in fee by non-Indians; lands which never left trust status; and lands removed from trust status which were subsequently reacquired by the Tribe and returned to that status. This later category, that of lands reac-

quired by the Tribe and returned to trust status, includes (1) lands opened to homesteading which were never claimed; (2) lands allotted to individual Indians who later sold their parcels to non-Indians; and (3) lands opened for homesteading which were acquired by non-Indians.

Changes in the ownership of lands within the Spokane Indian Reservation created doubts regarding the priority dates of the water rights appurtenant to those lands. Additionally, a question has arisen regarding the regulatory jurisdiction of the State of Washington concerning allocation of excess Chamokane Basin Water rights within the reservation and appurtenant to non-Indian lands.

### A. *Priority Dates for Reacquired Lands.*

The district court awarded a priority as of the date of the creation of the reservation to those water rights appurtenant to land which never left trust status and those water rights appurtenant to lands opened for homesteading which were never claimed. This award was based on the doctrine of tribal reserved *Winters* rights and is not at issue here. *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908).

Those water rights appurtenant to lands reacquired by the Tribe following allotment and sale to non-Indians or homesteading were awarded a priority date as of reacquisition by the Tribe. The United States takes issue with this determination. We hold that those perfected water rights appurtenant to homesteaded lands will not have a priority as of the date of reacquisition of the property by the Tribe; instead, they will carry a priority as determined under state law. Homesteaded lands where the water right has not been perfected or the rights have been lost, will have a priority date as of the date of reacquisition, rather than an original, date-of-the-reservation priority. We hold that those water rights appurtenant to lands reacquired after allotment and sale to non-Indians carry a priority date, as to those water rights not

lost to nonuse, as of the date of the creation of the reservation.

### 1. *The alloted lands.*

 When the United States establishes a federal reservation, it reserves the land and impliedly reserves the right to sufficient unappropriated water to fulfill the purposes of that reservation. *United States v. New Mexico,* 438 U.S. 696, 698–700, 98 S.Ct. 3012, 3013–3014, 57 L.Ed.2d 1052 (1978). The Supreme Court has applied this concept to Indians and Indian reservations, holding that the establishment of the reservation implies a right to sufficient unappropriated water to accomplish its purposes. *Winters v. United States,* 207 U.S. 564, 576–578, 28 S.Ct. 207, 211–212, 52 L.Ed. 340 (1908). These tribal reserved *Winters* rights vest on the date of the creation of the Indian reservation. *Id.* at 577, 28 S.Ct. at 211.

The Ninth Circuit has recently addressed the matter of *Winters* rights in the context of the sale of allotted lands to non-Indians. The court held that when title passed from an Indian to a non-Indian for an allotted parcel, the appurtenant right to share in tribal reserved waters passed with it. *Colville Confederated Tribes v. Walton,* 647 F.2d 42, 50 (9th Cir.1981), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981); *United States v. Adair,* 723 F.2d 1394 (9th Cir.1983). *See also United States v. Ahtanum Irrigation District,* 236 F.2d 321, 342 (9th Cir.1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957). The court's rationale in *Walton* was that, in order for an Indian allottee to enjoy the full benefit of his allotment, he must be able to sell his land together with the right to share in the reserved waters. 647 F.2d at 49–50. The court determined that the non-Indian successor also inherits his predecessor's priority—the date of the creation of the reservation. That priority date "is the principal aspect of the right that renders it more valuable than the rights of competing water users, and therefore applies to the right acquired by a non-Indian purchaser." *Id.* at 51. The

*Walton* decision accords with the Congressional policy of ensuring to an Indian allottee the full economic benefit of the allotment.

 The *Walton* decision makes it clear that reserved *Winters* rights do not cease to exist merely because the land passes out of Indian ownership. *Adair,* 723 F.2d at 1417 (citing *Walton,* 647 F.2d at 51). The Ninth Circuit held that the full quantity of water available to the Indian allottee thus may be conveyed to the non-Indian purchaser. It follows that upon reacquisition of these lands, the Tribe is equally entitled to an original priority date. We find, therefore, that *Winters* rights appurtenant to allotted lands conveyed to a non-Indian purchaser will pass with title upon reacquisition by the Tribe and will retain their original priority date.

 The Ninth Circuit has restricted its rule concerning the transfer of reserved rights appurtenant to allotted lands. The first restriction is that "the non-Indian successor's right to water is 'limited by the number of irrigable acres [of former reservation lands that] he owns.'" *Adair* at 1417 (citing *Walton, id.,* at 51). The second restriction may be simply expressed as: use it or lose it. *Walton,* 647 F.2d at 51. Pursuant to this restriction, a non-Indian successor acquires a right to that quantity of water being utilized at the time title passes, plus that amount of water which the successor puts to beneficial use with reasonable diligence following the transfer of title. Where "the full measure of the Indian's reserved water right is not acquired by this means and maintained through continued use, it is lost to the non-Indian successor." *Id.* Consequently, on reacquisition the Tribe reacquires only those rights which have not been lost through nonuse and those rights will have an original, date-of-the-reservation priority.

### 2. *The homesteaded properties.*

The Supreme Court has determined that a homesteader acquires no federal water rights incident to the transfer of public lands into private ownership. *California*

*Oregon Power Co. v. Beaver Portland Cement Co.,* 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356 (1935). Application of this rule to the case before us would terminate the availability of *Winters* rights on those reservation lands which have been declared public domain, opened to homesteading, and subsequently conveyed into private ownership. This result is supported by the fact that *Winters* rights were only intended to assist in accomplishing the needs of the reservation; where the land has been removed from the Tribe's possession and conveyed to a homesteader, the purposes for which *Winters* rights were implied are eliminated. *Winters v. United States,* 207 U.S. at 577, 28 S.Ct. at 211. Therefore, a homesteader is not entitled to rely on the *Winters* doctrine. The appropriation doctrine will serve as the source of his water rights. *See California Oregon Power Co.,* 295 U.S. at 164, 55 S.Ct. at 731 (Desert Land Act gives sanction to appropriation doctrine, seeking to remove impediment to its successful operation).

It is a basic tenent of western water law that water rights perfected through appropriation and not subsequently lost to nonuse or abandonment will generally pass with transfer of title to real property and will carry a priority date as of their original application to beneficial use. We see no reason to depart from this rule as to the perfected water rights of homesteaders on reacquisition of the property by the Tribe. As to lands in this category, state law determines the priority date.

Where the homesteader has no perfected water rights or has lost rights which were perfected, there are no rights to be regained by the Indians on reacquisition of the property. This principle protects the intervening rights, if any, that may have been acquired in good faith by third party water users during the homesteading process and prior to reacquisition by the Tribe. On return of the property to tribal status, it becomes necessary to utilize the *Winters* doctrine to assure that the Tribe has sufficient water to "fulfill the very purposes for which [the] reservation was created."

*United States v. Adair,* 723 F.2d at 1409 (citing *United States v. New Mexico,* 438 U.S. 696, 702, 98 S.Ct. 3012, 3015, 57 L.Ed.2d 1052 (1978)). We treat these lands in a manner analogous to that of a newly created federal reservation and find that the purposes for which *Winters* rights are implied arise at the time of reacquisition by the Tribe. *See generally Cappaert v. United States,* 426 U.S. 128, 138–144, 96 S.Ct. 2062, 2069–2072, 48 L.Ed.2d 523 (1976) (discussing the scope and nature of *Winters* water rights on federal lands). Therefore, we hold that the Tribe is entitled to an implication of *Winters* rights with a priority for these rights as of the date of reacquisition, rather than an original, date-of-the-reservation priority.

## B. *State Regulatory Jurisdiction*

In the case before us, the district court determined that it was permissible for the State of Washington to exercise regulatory jurisdiction over non-Indian use of excess Chamokane Basin waters on lands owned by non-Indians within the Spokane Indian Reservation. The Spokane Tribe takes issue with this determination, arguing that it, not the state, has jurisdiction by virtue of our decision in *Colville Confederated Tribes v. Walton.* We agree with the rationale of the district court in its unpublished Memorandum and Order, C.R. 252 at 22–28, and find that *Walton* is not controlling.

Regulatory jurisdiction of a state over non-Indian activities on a tribal reservation "may be barred either because it is pre-empted by federal law, or because it unlawfully infringes on the right of reservation Indians to self-government." *Walton,* 647 F.2d at 51. These barriers to regulation, although independent, are related by the concept of tribal sovereignty. *Id.* *See also White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980); *White Mountain Apache Tribe v. Arizona,* 649 F.2d 1274, 1278 (9th Cir.1981).

In 1980 the Supreme Court set forth a specific rule for analyzing preemption

claims in general and in cases involving non-Indians on reservations in particular.

> [Where] a state asserts authority over the conduct of non-Indians engaging in activities on the reservation [the court must make a] particularized inquiry into the nature of the state, federal and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

*White Mountain Apache Tribe v. Bracker*, 448 U.S. at 145, 100 S.Ct. at 2584. The Supreme Court further stated in *Bracker* that "[t]he tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been preempted by operation of federal law." 448 U.S. at 143, 100 S.Ct. at 2583 (citations omitted).

 Of course, tribal sovereignty is not absolute. In particular, the power to regulate generally the conduct of nonmembers on land no longer owned by or held in trust for the tribe is impliedly withdrawn as a necessary result of tribal dependent status. *Montana v. United States*, 450 U.S. 544, 564, 101 S.Ct. 1245, 1257, 67 L.Ed.2d 493 (1981); *see United States v. Wheeler*, 435 U.S. 313, 326, 98 S.Ct. 1079, 1087, 55 L.Ed.2d 303 (1978). Some exceptions to this implied withdrawal of tribal regulatory authority do exist.

> A tribe may regulate, through taxation, licensing or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements .... A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within the reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Montana v. United States*, 450 U.S. at 565–66, 101 S.Ct. at 1258–59 (citations omitted). This civil authority over non-Indians which the tribe retains, "derives not only from the tribe's inherent power necessary to self-government and territorial management, but also from the power to exclude nonmembers from tribal land." *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 592 (9th Cir.1983). *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141–44, 102 S.Ct. 894, 903–05, 71 L.Ed.2d 21 (1982).

Recent case law has affirmed tribal exercise of civil jurisdiction over nonmembers. Where nonmembers have transacted business with the tribe or entered onto tribal lands for other purposes, the Supreme Court has upheld the imposition of taxes or the assessment of special fees. *See Merrion v. Jicarilla Apache Tribe* (severance tax on non-Indian mining operation on reservation lands) and *Montana v. United States* (exclusion of nonmembers from hunting on tribal lands). Likewise, this circuit has upheld tribal economic, health and welfare regulations. *See Cardin v. De La Cruz*, 671 F.2d 363 (9th Cir.) (building, health and safety regulations applied to nonmember business located on fee lands within the reservation), *cert. denied*, 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982); *Confederated Salish and Kootenai Tribes v. Namen*, 665 F.2d 951 (9th Cir.) (regulation of riparian rights of non-Indians), *cert. denied*, 459 U.S. 977, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982).

In *Montana*, the Court permitted the Crow Tribe to regulate hunting by nonmembers on tribal lands but did not permit the Tribe to prohibit nonmembers from hunting on reservation lands owned in fee by nonmembers. *Montana v. United States*, 450 U.S. at 566–67, 101 S.Ct. at 1258–59. Three reasons were offered for this distinction.

> First, the non-Indians, who were hunting and fishing on non-Indian fee lands, had not "[entered into] any agreements or dealings with the Crow Tribe so as to subject themselves to tribal civil jurisdiction." Second, there had been no suggestion that the hunting and fishing activities on non-Indian fee land so "[threatened] the Tribe's political or eco-

nomic security as to justify tribal regulation." Finally, the complaint had failed to allege that such activities "[imperiled] the subsistance or welfare of the Tribe."

*Babbitt Ford, Inc. v. Navajo Indian Tribe,* 710 F.2d at 592 (citations omitted).

Applying these standards, we conclude that the State, not the Tribe, has the authority to regulate the use of excess Chamokane Basin waters by non-Indians on non-tribal, i.e., fee, land. Our review reveals no consensual agreement between the non-Indian water users and the Tribe which would furnish the basis for implication of tribal regulatory authority. We find no conduct which so threatens or has such a "direct effect on the political integrity, the economic security, or the health or welfare of the Tribe," as to confer tribal jurisdiction. *Montana v. United States,* 450 U.S. at 566, 101 S.Ct. at 1258. The water rights adjudication which furnishes the basis for the instant inquiry quantifies and preserves tribal water rights. The district court appointed a federal water master whose responsibility is to administer the available waters in accord with the priorities of all the water rights as adjudicated. *See Jicarilla Apache Tribe v. United States,* 601 F.2d 1116, 1122 (10th Cir. 1979). The district court recognized the importance of the tribal fishery and has awarded non-consumptive water rights to preserve it. The tribe is, of course, entitled to utilize its water for *any* lawful purpose. *Colville Confederated Tribes v. Walton,* 647 F.2d 42, 48 (9th Cir.1981). If the tribe chooses to use water reserved for irrigation in a non-consumptive manner, it does not thereby relinquish any of its water rights to state permittees or subject the exercise of its rights to state regulation. The state may regulate only the use, by non-Indian fee owners, of excess water. Any permits issued by the state would be limited to excess water. If those permits represent rights that may be empty, so be it.

It is evident, however, that the political and economic welfare of the Tribe will not suffer adverse impact from the state-regu-

lated use of surplus waters by nonmembers on non-Indian lands. Instead the factual situation points in favor of state regulation. First, no direct federal preemption of state regulation has occurred. No federal statute or regulatory scheme expressly or impliedly governs water use by non-Indians on the Spokane Reservation. Second, the balance of interest weighs most heavily in favor of the state.

The instant situation is contrary to that addressed by this circuit in *Colville Confederated Tribes v. Walton,* 647 F.2d 42 (1981). In *Walton,* we determined that state regulation of the water system was preempted when viewed in light of the Colville's right to self-government. *Walton,* 647 F.2d at 52. The *Walton* decision recognized the general rule of deference to state water law. 647 F.2d at 53. *Walton* rested on a determination that "deference is not applicable to water use on a federal reservation, at least where such use has no impact off the reservation." *Id.* (citing *FPC v. Oregon,* 349 U.S. 435 at 448, 75 S.Ct. 832 at 840, 99 L.Ed. 1215 (1955)). Although recognizing that the usual policy of deference

> stems in part from the need to permit western states to fashion water rights regimes that are responsive to local needs and in part from the "legal confusion that would arise if federal water law and state water law reigned side by side in the same locality,"

the *Walton* court found neither rationale applicable to the matter. *Id.* (citing *California v. United States,* 438 U.S. 645, 650, 653–54, 98 S.Ct. 2985, 2988, 2990–91, 57 L.Ed.2d 1018 (1978)). In accordance with its determination that neither of the policy considerations supporting deference to state jurisdiction would be fulfilled by permitting state regulation of the No Name System, the *Walton* court held such jurisdiction preempted by the creation of the Colville Reservation. *Id.*

The *Walton* decision was compelled by the geography and hydrology of the No Name Basin and its relationship to the Colville Reservation. The reservation lands in

question were allotted, not opened for entry and settlement. *Id.* at 53. The No Name hydrological system is non-navigable and is located *entirely* within the reservation. *Id.* at 52. Validation of the state-issued permits claimed by Walton could have jeopardized the agricultural use of downstream tribal users as well as the existence of the tribal fishery. *Id.* In essence, the interest of the Tribe in regulation of the waters of the No Name Basin was "critical to the lifestyle of its residents and the development of its resources." *Id.*

 The district court noted, and we agree, that because water per se lies within the exterior boundaries of an Indian reservation does not necessarily negate a state's interest in overseeing its usage along with the other in-state water systems. Washington is obligated to regulate and conserve water consumption for the benefit of all its citizens, including those who own land within a reservation in fee. *See* 25 U.S.C. § 349. Therefore, the state's special concern is shared with, not displaced by, similar tribal and federal interests when water is located within the boundaries of both the state and the reservation.[1] The weight of the state's interest depends, in large part, on the extent to which waterways or acquifers transcend the exterior boundaries of Indian country.

In *Walton*, the stream in question was small, non-navigable, and located entirely within the reservation and, as noted, water use by non-Indians would impact tribal agriculture and fisheries. Thus, even though some portion of the creek was found to be surplus to the tribe's requirements, state regulation of the remaining supply could create jurisdictional confusion and violate tribal sovereignty. In contrast, Chamokane Creek arises outside of the Spokane Indian Reservation and its course, for a good deal of its length, continues outside of that reservation. When the creek comes to the reservation, it forms the eastern *boundary*, and much of the reservation land with state water rights is immediately adjacent to the creek. The creek then separates from the reservation boundary, flowing into the Spokane River and eventually into the Columbia River and to the Pacific Ocean.

The facts in this case are readily distinguishable from the facts in the *Walton* decision. By weighing the competing federal, tribal and state interests involved, it is clear that the state may exercise its regulatory jurisdiction over the use of surplus, non-reserved Chamokane Basin waters by nonmembers on non-Indian fee lands within the Spokane Indian Reservation. Central to our decision is the fact that the interest of the state in exercising its jurisdiction will not infringe on the tribal right to self-government nor impact on the Tribe's economic welfare because those rights have been quantified and will be protected by the federal water master. Additionally, in view of the hydrology and geography of the Chamokane Creek Basin, the State of Washington's interest in developing a comprehensive water program for the allocation of surplus waters weighs heavily in favor of permitting it to extend its regulatory authority to the excess waters, if any, of the Chamokane Basin. State permits issued for any such excess water will be subject to all preexisting rights and those preexisting rights will be protected by the federal court decree and its appointed water master. We do not believe there is any realistic infringement on tribal rights and protected affairs. If there is any intrusion, it is minimal and permissible under all of the circumstances of this case.

---

**1.** In arguing that tribal regulatory authority over all water within the reservation was essential, the tribe raised the possibility that because land owned in fee occupied most of the waterfront property within the reservation, state regulation of water use on fee land could effectively prevent the tribe from exercising its water rights. We conclude that by appointing a water master charged with protecting all water rights and ensuring compliance with the court decree, the district court provided adequate safeguards. The mere issuance of a state permit does not impinge on tribal rights. If Washington were to approve permits that granted rights to use non-existent water or infringed on the tribe's prior water rights, the water master would be obliged to modify them or to give them no effect.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM in part and REVERSE in part and RE-MAND for further proceedings in accordance with this decision.