JUSTICE RICE
delivered the Opinion of the Court.
¶1 Bud Clinch, Director of the Montana Department of Natural Resources and Conservation (DNRC), and the DNRC appeal from the order of the First Judicial District Court, Lewis and Clark County, granting summary judgment in favor of the Confederated Salish and Kootenai Tribes (Tribes). We reverse and remand for further proceedings.
¶2 We consider the following issue on appeal:
¶3 Can DNRC process applications to change the use of state appropriative water rights on the Flathead Reservation prior to quantification of the Tribes’ reserved rights?
BACKGROUND
¶4 James and Katherine Axe, non-Indian owners of two appropriative water rights on the Flathead Indian Reservation (Reservation), applied to the DNRC to change the use of those water rights from irrigation to recreation so that they could operate a water ski pond. The Tribes brought suit against DNRC to enjoin it from processing the change application. The District Court granted a temporary restraining order followed by a preliminary injunction preventing DNRC from conducting any proceeding pertaining to the Axes’ application. After unsuccessful negotiations between the Tribes and DNRC, the District Court ultimately granted summary judgment in favor of the Tribes and issued a permanent injunction. The District Court concluded that DNRC could not determine whether the Axes’ proposed change would adversely affect the use of the Tribes’ rights in the absence of a quantification of the Tribes’ reserved rights. DNRC appeals.
STANDARD OF REVIEW
¶5 We articulated the standard of review for grants of summary *305 judgment in Grimsrud v. Hagel, 2005 MT 194, ¶ 14, 328 Mont. 142, ¶ 14, 119 P.3d 47, ¶ 14 (citations and quotation marks omitted):
This Court’s review of a district court’s grant of summary judgment is de novo. Our evaluation is the same as that of the trial court. We apply the criteria contained in Rule 56, M.R.Civ.P. According to this rule, the moving party must establish both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. If this is accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. If the court determines that no genuine issues of fact exist, the court must then determine whether the moving party is entitled to judgment as a matter of law.
¶6 This Court reviews a district court’s conclusions of law for correctness. Galassi v. Lincoln County Bd. of Com’rs, 2003 MT 319, ¶ 7, 318 Mont. 288, ¶ 7, 80 P.3d 84, ¶ 7.
DISCUSSION
¶7 Can DNRC process applications to change the use of state appropriative water rights on the Flathead Reservation prior to quantification of the Tribes’ reserved rights?
¶8 In State ex rel. Greely v. Confederated Salish & Kootenai Tribes, 219 Mont. 76, 712 P.2d 754 (1985), this Court described the two kinds of water rights at issue here:
State appropriative water rights and Indian reserved water rights differ in origin and definition.
Appropriative rights are based on actual use. Appropriation for beneficial use is governed by state law. Reserved water rights are established by reference to the purposes of the reservation rather than to actual, present use of the water. The basis for an Indian reserved water right is the treaty, federal statute or executive order setting aside the reservation.
Greely, 219 Mont. at 89-90, 712 P.2d at 762.
¶9 DNRC argues that the Axes have a fundamental constitutional right to change the use of their appropriative water rights. Additionally, DNRC contends that the District Court erred in granting summary judgment because genuine issues of material fact remained pertaining to whether the change of use would adversely affect the use of the Tribes’ reserved water rights. In support of its argument, DNRC maintains that in § 85-2-402, MCA, the Legislature has specifically *306 provided for the processing of water use change applications prior to a final adjudication of the Tribes’ reserved rights.
¶10 The Tribes respond that their reserved water rights are senior to all state appropriative water rights on the Reservation and, further, that all state appropriative claims are merely “claims” and not “rights.” Without a final quantification of the Tribes’ reserved rights, the Tribes contend that it is impossible to determine whether a change in the use of an existing claim will adversely affect the use of the Tribes’ rights under the standard in § 85-2-402(2)(a), MCA.[1] The Tribes also argue that change of use proceedings are improper piecemeal adjudications prohibited by the McCarran Amendment, codified at 43 U.S.C. § 666, and that they should not have to intervene in multiple change of use proceedings-which are separate from and in addition to a comprehensive adjudication of rights-in order to ensure that their rights are not infringed.
¶11 At oral argument, the parties focused on the McCarran Amendment’s relevance to the issue before this Court, so we will begin our analysis there. After interpreting and applying the McCarran Amendment to the instant case, we will discuss the complex jurisprudence relating both to the Amendment and to tribal sovereignty, and we will apply that jurisprudence to this matter. Finally, we will conclude with a comment on the so-called “trilogy” of our cases-Ciotti, Clinch, and Stults[2]-that address closely related issues and explain what our holding here means in the context of those decisions.
I. The McCarran Amendment.
¶12 Title 43, Section 666, United States Code (enacted July 10,1952, c. 651, Title II, § 208(a)-(c), 66 Stat. 560.), commonly known as the McCarran Amendment due to its sponsorship by Nevada Senator Pat McCarran, reads as follows:
§ 666. Suits for adjudication of water rights
*307 (a) Joinder of United States as defendant; costs. Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: Provided, That no judgment for costs shall be entered against the United States in any such suit.
(b) Service of summons. Summons or other process in any such suit shall be served upon the Attorney General or his designated representative.
(c) Joinder in suits involving use of interstate streams by State. Nothing in this section shall be construed as authorizing the joinder of the United States in any suit or controversy in the Supreme Court of the United States involving the right of States to the use of the water of any interstate stream.
¶13 A plain reading of the statute’s text indicates that the United States has waived its sovereign immunity so that it may be joined as a defendant when it is a necessary party in cases seeking to adjudicate or administer water rights in state courts.[3] The United States Supreme Court has interpreted this waiver to extend to the Indian tribes, providing consent to determine in state court federal reserved water rights held on behalf of Indians. Colorado River Water Cons. Dist. v. U.S., 424 U.S. 800, 809, 96 S. Ct. 1236, 1242 (1976). The Amendment’s *308 waiver is not for purposes of private suits against the United States or the Indian tribes; rather, it is limited to comprehensive state adjudications of water rights. Dugan v. Rank, 372 U.S. 609, 618, 83 S. Ct. 999, 1005 (1963); U.S. v. District Court for Eagle County, 401 U.S. 520, 525, 91 S. Ct. 998, 1002 (1971); U.S. v. District Court for Water Div. No. 5, 401 U.S. 527, 529, 91 S. Ct. 1003, 1005 (1971).
¶14 In support of their argument that change of use proceedings are improper “piecemeal” adjudications, the Tribes contend that, according to judicial interpretation of the McCarran Amendment,
DNRC has no jurisdiction over the Tribes and their water rights except within the context of a general inter sese water rights adjudication that satisfies McCarran requirements. Absent a proper McCarran adjudication, the Tribes retain sovereign immunity from all DNRC proceedings. Greelv. 219 Mont. 84-85, 712 P.2d at 759; Stults. ¶¶ 38-39.
It is not entirely clear what the Tribes mean. In the case at bar, the Tribes are not defendants, nor are they generally parties to DNRC proceedings that administer state appropriative rights; thus, to speak of the Tribes’ sovereign immunity from such proceedings is inapt. Moreover, sovereign immunity is a doctrine that precludes a party from suing a sovereign government without that government’s consent, see Black’s Law Dictionary (8th ed. 2004), and it is not at all clear that DNRC’s change of use proceedings are “suits.” However, the above quotation expresses the sentiment that is a common thread throughout the Tribes’ argument: that DNRC lacks authority to regulate state appropriative water rights held by non-Indians on fee land within the boundaries of the Reservation. Though not squarely addressed by the parties, we must address this issue of tribal sovereignty-which is broader than sovereign immunity-as a necessary predicate to deciding whether change of use proceedings of this type are permissible under Montana law. See Leichtfuss v. Dabney, 2005 MT 271, ¶ 37 n. 8, 329 Mont. 129, ¶ 37 n. 8, 122 P.3d 1220, ¶ 37 n. 8 (“ ‘a court may consider an issue “antecedent to ... and ultimately dispositive of’ the dispute before it, even an issue the parties fail to identify and brief.’ ” (quoting United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 447, 113 S. Ct. 2173, 2178 (1993))). If, by virtue of the Tribes’ sovereignty, the State were to have no regulatory authority over water rights on non-Indian fee land on the Reservation, then Montana law on the subject would be irrelevant. See Ciotti, 278 Mont. at 65, 923 P.2d at 1082 (“In the absence of state jurisdiction to regulate or administer tribal water, *309 compliance with the Water Use Act is immaterial.” (Leaphart, J., concurring)).
¶ 15 Before embarking on our sovereignty analysis, we must clarify the law as it relates to the McCarran Amendment. The Tribes’ argument and some of the language used by this Court on the subject in Stults, ¶¶ 20, 38-39, misconstrues the holding of Colorado River and conflates three concepts: federal abstention, sovereign immunity, and sovereignty.[4]
¶16 In Colorado River, the United States Supreme Court held that a federal district court, in deferring to a similar comprehensive state court proceeding then in progress, properly dismissed an action by the United States seeking to adjudicate water rights in several rivers and their tributaries. The Court gave the following rationale:
Turning to the present case, a number of factors clearly counsel against concurrent federal proceedings. The most important of these is the McCarran Amendment itself. The clear federal policy evinced by that legislation is the avoidance of piecemeal adjudication of water rights in a river system.... The consent to jurisdiction given by the McCarran Amendment bespeaks a policy that recognizes the availability of comprehensive state systems for adjudication of water rights as the means for achieving these goals.
Colorado River, 424 U.S. at 819, 96 S. Ct. at 1247 (emphasis added). In a sequel to Colorado River, Arizona v. San Carlos Apache Tribe, 463 U.S. 545, 103 S. Ct. 3201 (1983), the Court held that federal district courts should dismiss suits brought by Indian tribes for the adjudication of water rights in favor of concurrent comprehensive state proceedings. The Court reiterated its rationale from Colorado River:
The McCarran Amendment, as interpreted in Colorado River, allows and encourages state courts to undertake the task of quantifying Indian water rights in the course of comprehensive water adjudications. Although adjudication of those rights in *310 federal court instead might in the abstract be practical, and even wise, it will be neither practical nor wise as long as it creates the possibility of duplicative litigation, tension and controversy between the federal and state forums, hurried and pressured decisionmaking, and confusion over the disposition of property rights.
San Carlos Apache, 463 U.S. at 569, 103 S. Ct. at 3215. That the text of the McCarran Amendment was not determinative for either of the above holdings is evidenced by the fact that the United States and Indian tribes were plaintiffs in those cases. As noted above, the Amendment’s waiver of immunity as stated in the text applies only when the United States or Indian tribes are joined as defendants.
¶17 Other than to apply the waiver to the Indian tribes, see ¶ 13, the United States Supreme Court did not consider in either Colorado River or San Carlos Apache the extent or quality of the immunity waived by the Amendment. Indeed, the Court did no statutory interpretation of the McCarran Amendment at all. See San Carlos Apache, 463 U.S. at 573, 103 S. Ct. at 3217 (“one may search in vain for any textual support for the Court’s holding”) (Stevens, J., and Blackmun, J., dissenting). Rather, it used the perceived public policy underlying the Amendment to fashion a new form of federal abstention doctrine. See Colorado River, 424 U.S. at 819, 96 S. Ct. at 1247 (“The clear federal policy evinced by that legislation is the avoidance of piecemeal adjudication of water rights in a river system.” (Emphasis added.)); San Carlos Apache, 463 U.S. at 572, 103 S. Ct. at 3216 (“In [Colorado River] this Court recognized a narrow rule of abstention governing controversies involving federal water rights.”) (Marshall, J., dissenting). The federal courts’ abstention doctrine does not necessarily have any relevant relationship to a waiver of sovereign immunity because the two concepts are separate and distinct. As already mentioned, sovereign immunity precludes a party from suing a sovereign government without that government’s consent, whereas abstention relates to when a court “may decline to exercise or postpone the exercise of its jurisdiction ....” Colorado River, 424 U.S. at 813, 96 S. Ct. at 1244. The connection that the Court in Colorado River and San Carlos Apache established between the two has only to do with a policy preference that comprehensive water rights adjudication should take place in state courts rather than federal courts.
¶18 Despite the Tribes’ intimation to the contrary, that federal court policy preference, though relevant, is not necessarily determinative of the question whether DNRC’s regulation of state appropriative water *311 rights on the Reservation infringes on the Tribes’ sovereignty, i.e., the supreme dominion, authority, or rule that governments typically enjoy. See Black’s Law Dictionary (8th ed. 2004); see also City of Bisbee v. Cochise County, 78 P.2d 982, 985-87 (Ariz. 1938). Though the doctrine of sovereign immunity is derived from sovereignty, see The Federalist No. 81 (Alexander Hamilton) (“It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.”), it is a much narrower concept limited to the realm of lawsuits. As stated above, in the immediate context, issues of sovereignty-but not immunity-determine the extent to which the State, via DNRC, can regulate activities within the boundaries of the Reservation without offending the status of the Tribes as “‘domestic dependent nations’ that exercise inherent sovereign authority over their members and territories.” Oklahoma Tax Comm’n v. Potawatomi Tribe, 498 U.S. 505, 509, 111 S. Ct. 905, 909 (1991). To resolve this tension between sovereigns, we turn now to examine jurisprudence more specifically addressing the relationship between state regulatory power and the right of Indian tribes to govern their lands.
II. Sovereignty.
¶19 The Indian tribes have a unique status in our federal system:
Though tribes are often referred to as “sovereign” entities, it was “long ago” that “the Court departed from Chief Justice Marshall’s view that ‘the laws of [a State] can have no force’ within reservation boundaries.” “Ordinarily,” it is now clear, “an Indian reservation is considered part of the territory of the State.”
Nevada v. Hicks, 533 U.S. 353, 361-62, 121 S. Ct. 2304, 2311 (2001) (brackets in original; citations omitted). This aberrant status has led to a complex body of jurisprudence attempting to describe the respective bounds of the authority of the Indian tribes and the States.
¶20 There exist two general and overlapping approaches to analyzing the interaction of state regulatory authority and tribal self-government.[5] The first, exemplified by Montana v. United States, 450 *312 U.S. 544, 101 S. Ct. 1245 (1981), takes the perspective of the tribe and seeks to identify the scope of authority it possesses. The second, embodied in White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S. Ct. 2578 (1980), takes the perspective of the state and seeks to prescribe the limits of its power.
¶21 In Montana, the United States Supreme Court considered whether the Crow Tribe had the power to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers. The Court recognized that “the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe,” but it nonetheless stated that:
Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. [Citations omitted.] A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.
Montana, 450 U.S. at 565-66, 101 S. Ct. at 1258. Applying this test, the Court concluded that “[n]o such circumstances” were present, Montana, 450 U.S. at 566, 101 S. Ct. at 1259, and that “regulation of hunting and fishing by nonmembers of a tribe on lands no longer owned by the tribe bears no clear relationship to tribal self-government or internal relations.” Montana, 450 U.S. at 564, 101 S. Ct. at 1258. Accordingly, the Court held that the Crow Tribe could not prohibit hunting and fishing within the reservation by nonmembers of the Tribe on non-Indian fee land.
¶22 In Bracker, the United States Supreme Court considered whether Arizona’s application of motor carrier license and use fuel taxes to a non-Indian logging company operating entirely on an Indian reservation was preempted by federal law. The Court stated that “there is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members” because
*313 the tribes have retained a semi-independent position not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.
Bracker, 448 U.S. at 142, 100 S. Ct. at 2583 (internal quotation marks and ellipsis omitted). The Court went on to articulate
two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. [Citations omitted.] Second, it may unlawfully infringe “on the right of reservation Indians to make their own laws and be ruled by them.” [Citations omitted.] The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members.
Bracker, 448 U.S. at 142-43, 100 S. Ct. at 2583. Where “a State asserts authority over the conduct of non-Indians engaging in activity on the reservation” this test does not depend “on mechanical or absolute conceptions of state or tribal sovereignty,” but it requires a “particularized inquiry into the nature of the state, federal, and tribal interests at stake[.]” Bracker, 448 U.S. at 144-45, 100 S. Ct. at 2584. The Court concluded that Arizona’s authority to impose taxes was preempted by the comprehensive federal regulatory scheme governing logging on Indian reservations. Bracker, 448 U.S. at 148, 100 S. Ct. at 2586.
¶23 Because the present case concerns the State’s regulation of activity on non-Indian land within the Reservation’s boundaries, we conclude that the Bracker test is more pertinent, though Montana provides a useful backdrop.[6] Cf. Wagnon v. Prairie Band Potawatomi Nation, 546 U.S. 95, 126 S. Ct. 676, 680 (2005) (“But the Bracker interest-balancing test applies only where ‘a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.’” (quoting Bracker, 448 U.S. at 144, 100 S. Ct. at 2578)). This conclusion builds on and is congruent with our decision in In re *314 Skillen in which we held that the Bracker test applies to resolve a “jurisdictional conflict regarding a regulatory matter ....” In re Marriage of Skillen, 1998 MT 43, ¶ 44, 287 Mont. 399, ¶ 44, 956 P.2d 1, ¶ 44 (differentiating Bracker from the test in State ex rel. Iron Bear v. District Court, 162 Mont. 335, 512 P.2d 1292 (1973), which applies to jurisdictional conflicts relating to adjudicatory matters).
¶24 The two cases most relevant to the issue here do not come from our own case law, however, but from the United States Court of Appeals for the Ninth Circuit, which has twice applied Bracker when considering whether states can regulate water on reservation lands.
¶25 In Colville Confederated Tribes v. Walton, 647 F.2d 42 (9th Cir. 1981), the Court examined whether the State of Washington could grant water permits to a non-Indian owner of allotted lands located within the No Name Basin on the Colville Reservation. Citing both Montana and Bracker, the Court concluded that Washington did not have authority to regulate these water rights:
Where land is set aside for an Indian reservation, Congress has reserved it for federal, as opposed to state needs. Because the No Name System is located entirely within the reservation, state regulation of some portion of its waters would create the jurisdictional confusion Congress has sought to avoid.
[W]e note that the state’s interest in extending its water law to the reservation is limited in this case. Tribal or federal control of No Name waters will have no impact on state water rights off the reservation.
Walton, 647 F.2d at 53.
¶26 Walton stands in contrast to the Court’s decision three years later in United States v. Anderson, 736 F.2d 1358 (9th Cir. 1984). In Anderson, the Court held that “the State [of Washington], not the Tribe, has the authority to regulate the use of excess Chamokane Basin waters by non-Indians on non-tribal, i.e., fee, land.” Anderson, 736 F.2d at 1365. Again applying both Montana and Bracker, the Court stated, “Central to our decision is the fact that the interest of the state in exercising its jurisdiction will not infringe on the tribal right to self-government nor impact on the Tribe’s economic welfare because [the Tribe’s reserved] rights have been quantified ....’’Anderson, 736 F.2d at 1366. However, a broader inquiry was necessary to resolve the question. Distinguishing Walton, the Court noted that the hydrology of the basins at issue in the two cases were significantly different in their size and impact. In Walton, “the stream in question was small, *315 non-navigable, and located entirely within the reservation,” whereas the Chamokane Creek originated outside of the Spokane Indian Reservation, formed part of the eastern boundary of the reservation, and then flowed away from the reservation and eventually to the Pacific Ocean. Anderson, 736 F.2d at 1366. In these circumstances, the Court concluded that “the State of Washington’s interest in developing a comprehensive water program for the allocation of surplus waters weighs heavily in favor of permitting it to extend its regulatory authority to the excess waters, if any, of the Chamokane Basin.” Anderson, 736 F.2d at 1366.
¶27 Walton was decided under the first prong of the Braeker test, preemption. Anderson was decided on the basis of the second, sovereignty. Despite the paucity of sovereignty analysis in Walton and the lack of preemption analysis in Anderson, one common factor appears to have weighed heavily in the Court’s application of Braeker's “particularized inquiry” of the interests at stake in each of the above cases: the degree to which regulation of the waters at issue affects water rights off the reservation. See Walton, 647 F.2d at 53 (“Tribal or federal control of No Name waters will have no impact on state water rights off the reservation.”); Anderson, 736 F.2d at 1366 (“The weight of the state’s interest depends, in large part, on the extent to which waterways or acquifers [sic] transcend the exterior boundaries of Indian country.”).
¶28 This commonality is consistent with the decision in New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 103 S. Ct. 2378 (1983), in which the United States Supreme Court articulated the principles that guided its consideration of “New Mexico’s claim that it may superimpose its own hunting and fishing regulations on the Mescalero Apache Tribe’s regulatory scheme,” as those regulations related to nonmembers on the reservation. New Mexico, 462 U.S. at 336-37, 103 S. Ct. at 2388. The Court stated that in assessing the “interest asserted to justify state jurisdiction over a reservation ... [a] State’s regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate state intervention.” New Mexico, 462 U.S. at 336, 103 S. Ct. at 2387-88; see also Rice v. Rehner, 463 U.S. 713, 724, 103 S. Ct. 3291, 3298 (1983). Applying the Bracker test, the Court concluded that New Mexico’s regulations were preempted by the “comprehensive tribal regulatory scheme ...." New Mexico, 462 U.S. at 344, 103 S.Ct. at 2392.
¶29 From the foregoing precedent, we conclude that two factual inquiries which are intertwined with the Braeker test will drive the *316 legal determination of whether DNRC has the sovereign authority to process the change of use application at issue here. First, off-Reservation effects must be assessed. Second, the impact that the processing of these applications may have on the Tribes’ political integrity, economic security, health, or welfare must be determined.
¶30 The first inquiry has two sides to it. In Walton, the Court noted that federal or tribal regulation of the waters at issue would have no impact on state rights off the reservation. This aspect of the inquiry is not determinative in the present case, however, because neither the Tribes nor the federal government have asserted regulatory authority over the Axes’ water rights. In Anderson, by contrast, where the hydrology of the basin was such that state rights to the basin’s water were implicated both on the reservation and downstream of it, the Court implicitly concluded that an absence of state authority to regulate waters on the reservation in excess of tribal rights would adversely affect state water rights holders downstream. With respect to the Axes’ change of use application, we simply do not know what effect such an absence of authority would have on other state water rights holders. Indeed, we do not even know, from the record before us, whether there are other state water rights holders downstream of the Axes, on or off the Reservation.
¶31 The second inquiry drives at the heart of the dispute between the Tribes and DNRC. To decide whether processing the Axes’ change of use application will have some direct effect on the Tribes’ political integrity, economic security, health, or welfare, we must first know-at the least-whether the change of use would adversely affect the Tribes’ reserved water rights because, as has been said many times, water is the lifeblood of the West. See, e.g., Walton, 647 F.2d at 52 (“Especially in arid and semi-arid regions of the West, water is the lifeblood of the community.”); In re General Adjudication of All Rights to Use Water in Big Horn River Sys., 835 P.2d 273, 279 (Wyo. 1992) (‘Water is the lifeblood of Wyoming.”).[7] Whether the change of use would adversely affect the Tribes and whether such assertion of regulatory authority by the State would have a direct effect on the Tribes are legal conclusions. However, these legal conclusions must emanate from a developed factual record, which is absent here.
¶32 As explained, these factual inquiries are intertwined with the *317 Bracker test. We can, and do, conclude that the State’s authority has not been preempted by federal or tribal interests because, as noted, neither the Tribes nor the federal government have asserted regulatory authority over the Axes’ water rights. Cf. Bracker, 448 U.S. 136, 100 S. Ct. 2578 (pervasive federal regulatory scheme preempted state’s authority to regulate). Thus, DNRC is not preempted from processing the Axes’ change of use application. However, it is not at all clear whether this DNRC process would infringe on the Tribes’ sovereignty -under the second prong of Bracker. This prong, as we have intimated, is informed by the overlapping Montana test-that is, we must inquire whether the DNRC regulatory process at issue here would “threaten[] or ha[ve] some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.” To properly resolve this sovereignty question, we need a more fully developed factual record addressing the matters discussed in ¶¶ 29-31, above.
III. The "Trilogy.”
¶33 If the sovereignty analysis were to be resolved in the Tribes’ favor, then there would be no need to consider whether Montana law authorizes change of use proceedings on the Reservation. However, on the other hand, if DNRC does not have authority according to state law to process the Axes’ change of use application, then it would make no practical difference whether DNRC has sovereign authority, by virtue of the federal law discussed above, to do so. For this reason, we consider it necessary to evaluate whether DNRC is authorized by Montana law to process the Axes’ application.
¶34 This Court has considered similar issues in three previous cases, Ciotti, Clinch, and Stults. In Ciotti, we held that applicants for new water use permits and for changes of use of water permits on the Reservation could not prove, by the terms of the Montana Water Use Act, Title 85, Chapter 2, MCA, that the proposed uses would not unreasonably interfere with the Tribes’ rights until those rights became quantified. Thus, DNRC did not have authority under state law to grant or change water use permits on the Reservation until that quantification was completed. Ciotti, 278 Mont. at 61, 923 P.2d at 1080. The Legislature responded to our decision in Ciotti with Senate Bill 97 in which it amended several provisions of the Water Use Act and expressed its intent to negate Ciotti’s holding:
The legislature intends that the Montana Supreme Court’s decision in [Ciotti] be negated by the passage and approval of this bill.... It is the intent of the legislature that the statutory *318 determinations for issuing new water use permits and authorizing changes do not require the adjudication of all water rights in the source of supply. The legislature recognizes the unique character and nature of water resources of the state. Because water is a resource that is subject to use and reuse, such as through return flows, and because at most times all water rights on a source will not be exercised to their full extent simultaneously, it is recognized that an adjudication is not a water availability study. Consequently, the legislature has provided an administrative forum for the factual investigation into whether water is available for new uses and changes both before and after the completion of an adjudication in the source of supply. To allow for orderly permitting in the absence of a complete adjudication in the source of supply, permits issued under this chapter are provisional. A provisional permit is subject to reduction, modification, or revocation by the department as provided in 85-2-313 upon completion of the general adjudication.
1997 Laws of Mont., ch. 497, 2790-91.
¶35 In Clinch, we again considered whether DNRC could issue new water use permits, this time under the amended provisions of § 85-2-311, MCA, enacted in response to our holding in Ciotti. Specifically, our holding turned on whether water was “legally available” on the Reservation, and we again concluded that DNRC could not make such a determination because it was unknowable how the issuance of permits for new uses would affect the Tribe’s rights until those rights were quantified. Clinch, ¶ 28.
¶36 Stults was the result of a dispute about the meaning of our decision in Clinch. DNRC argued there that Ciotti and Clinch applied only to surface water and not groundwater. Stults, ¶ 25. This Court disagreed, stating, “DNRC cannot process or issue beneficial water use permits on the Flathead Reservation until such time as the prior pre-eminent reserved water rights of the Tribes have been quantified.” Stults, ¶ 37.
¶37 At issue in Ciotti were applications for new use permits as well as one application for a change in the use of an existing permit, Ciotti, 278 Mont. at 52, 923 P.2d at 1075, and our holding applied to both types of applications. Ciotti, 278 Mont. at 54 n. 1, 923 P.2d at 1076 n. 1. Clinch and Stults concerned only new use permits. However, the Legislature’s efforts to negate Ciotti by amending the water use statutes and some of the language employed in the three cases have left it unclear whether this Court deems that a change in use of an *319 existing permit necessarily commits the same offense under the current water use statutes to the Tribes’ unquantified reserved rights as does the issuance of new use permits. We hold that it does not.
¶38 On its face, an application for a new use of water on the Reservation means that, if approved, more water will be taken from the available supply. By contrast, a change in use, by definition, means that no more water will be diverted than is currently. We acknowledge the point made in Ciotti, Clinch, and Stults that state appropriative rights are different in quality and character than the Tribes’ reserved rights, Ciotti, 278 Mont. at 55-58, 923 P.2d at 1076-78, Clinch, ¶ 12, Stults, ¶ 28, and that the Tribes’ rights may include non-consumptive rights, instream flow rights, or diversion rights, or all of the above. See Greely, 219 Mont. at 91-94, 712 P.2d at 763-65. However, we see no compelling reason to deprive a holder of a state water right-who is already using a given amount of water-of the opportunity to prove by a preponderance of the evidence that the proposed change will not adversely affect the use of other water rights, including the Tribes’ reserved rights. It very well could be that a change in use would adversely affect the use of the Tribes’ rights or that an applicant for a change of use cannot prove a lack of adverse effect on the use of the Tribes’ unquantified rights. However, we are not prepared to hold that it is impossible, as a matter of law, for an applicant to meet that burden.
¶39 The Legislature has made it clear that DNRC should be able to process change of use applications. Section 85-2-402(1), MCA, reads in part as follows:
In a change proceeding under this section, there is no presumption that an applicant for a change in appropriation right cannot establish lack of adverse effect prior to the adjudication of other rights in the source of supply pursuant to this chapter.
In the record of the District Court proceedings below there was testimony to the effect that it was possible for parties to demonstrate no adverse effect on the Tribes’ reserved rights. We express no opinion on such feasibility. This Court does, however, conclude that § 85-2-402, MCA, appropriately provides for no presumption to work against a water use permit holder who seeks to change the approved use.
¶40 Therefore, we hold that by determining that no presumption operates against a permit holder who seeks a change of use, the Legislature has acted within its constitutional prerogative. In Clinch, we stated that
*320 to issue [new] water use permits on the Flathead Reservation prior to the quantification of the Tribes pervasive reserved right requires use of water which may belong to the Tribe and would, therefore, violate Article IX, Section 3(1) of the Montana Constitution which protects existing water rights whether adjudicated or unadjudicated....
Clinch, ¶ 27. By its nature, a permit’s change of use does not necessarily “require use of water which may belong to the Tribe;” thus, without a further record, we cannot conclude that it offends Article IX, Section 3(1) of the Montana Constitution. However, nothing in our holding should be construed to prejudice the Tribes’ claims to reserved water rights. Indeed, we emphasize that the Tribes need not participate in the DNRC process and that the Tribes are not bound by the DNRC’s decisions. In addition, we do not mean to imply that a state water use permit holder can, in fact, prove by a preponderance of the evidence that a change in use will not adversely affect the use of the Tribes’ rights. We merely conclude that a permit holder is afforded the opportunity to do so by virtue of § 85-2-402, MCA.
¶41 Because of our holding above, we need not address whether changing the use of a state appropriative water right is a fundamental constitutional right. In addition, we discern no merit in the Tribes’ argument that all state appropriative rights on the Reservation are merely “claims” and not “rights.” See Art. IX, Sec. 3(1), Mont. Const.; § 85-2-101(4), MCA.
CONCLUSION
¶42 Before DNRC can process the Axes’ change of use application, the District Court must decide whether DNRC has the sovereign authority to conduct such proceedings. Central to the District Court’s analysis will be a consideration of the off-Reservation effects involved in the State’s assertion of regulatory authority or lack thereof and the impact the processing of the Axes’ application may have on the Tribes’ economic security, health, or welfare-including whether the change of use would adversely affect the Tribes’ reserved water rights.
¶43 If it is established that DNRC has sovereign authority to process the application, the District Court must permit the Axes to attempt to prove by a preponderance of the evidence that the “proposed change in appropriation right will not adversely affect the use of the existing water rights of other persons,” § 85-2-402(2)(a), MCA, including the Tribes’ reserved rights.
*321 ¶44 Accordingly, we conclude that the District Court erred in granting summary judgment in favor of the Tribes. Likewise, the permanent injunction was erroneously imposed and is hereby removed.
¶45 Reversed and remanded for further proceedings.
CHIEF JUSTICE GRAY, JUSTICES WARNER, DISTRICT JUDGE CURTIS, sitting in place of JUSTICE MORRIS and DISTRICT JUDGE LANGTON sitting in pace of JUSTICE LEAPHART concur.

 Section 85-2-402(2), MCA, reads in part:
[T]he department shall approve a change in appropriation right if the appropriator proves by a preponderance of evidence that the following criteria are met:
(a) The proposed change in appropriation right will not adversely affect the use of the existing water rights of other persons ....

 Matter of Beneficial Water Use Permits, 278 Mont. 50, 923 P.2d 1073 (1996) (Ciotti); Salish and Kootenai Tribes v. Clinch, 1999 MT 342, 297 Mont. 448, 992 P.2d 244 (Clinch); Salish and Kootenai Tribes v. Stults, 2002 MT 280, 312 Mont. 420, 59 P.3d 1093 (Stults).

 For McCarran purposes, administration of water rights can happen only after their adjudication. “To come within § 666(a)(2), a suit must seek to enforce or administer rights of the sort covered by § 666(a)(1), already adjudicated.” Orff v. U.S., 358 F.3d 1137, 1143 n. 3 (9th Cir. 2004), citing United States v. Hennen, 300 F. Supp. 256, 263 (D. Nev. 1968). “To administer a decree is to execute it, to enforce its provisions, to resolve conflicts as to its meaning, to construe and to interpret its language. Once there has been such an adjudication and a decree entered, then one or more persons who hold adjudicated water rights can, within the framework of § 666(a)(2), commence among others such actions as described above, subjecting the United States, in a proper case, to the judgments, orders and decrees of the court having jurisdiction.” Hennen, 300 F. Supp. at 263.

 The Tribes and the cited portions of Stults misappropriate terms used in Colorado River and Arizona v. San Carlos Apache Tribe, 463 U.S. 545, 103 S. Ct. 3201 (1983), describing DNRC proceedings as improper “piecemeal” proceedings or adjudications. As the following discussion demonstrates, Colorado River and San Carlos Apache use the term “piecemeal” to describe the potential for simultaneous federal and state adjudications of the same water rights. These cases make no reference to agency proceedings as “adjudications,” and in no instance do they apply the term “piecemeal” to anything other than this potential federal-state duplication. But cf. U.S. v. State of Or., 44 F.3d 758 (9th Cir. 1994) (holding that the McCarran Amendment waives sovereign immunity for administrative agency proceedings where they are necessary components of the comprehensive state adjudication).

 According to documents filed by the parties in the District Court, more than a decade ago the Tribes filed a claim in United States District Court for the District of Montana that is currently stayed by order of that court. The stay was upheld by Confederated Salish v. Simonich, 29 F.3d 1398 (9th Cir. 1994). According to the Tribes’ brief in support of their motion for a temporary restraining order or injunction filed April 23, 2001, the federal court claim raises federal issues similar to those that we address here. We mention this federal proceeding only to note that it is appropriate for this Court to address issues of federal law, regardless of whether those claims have been raised elsewhere. San Carlos Apache, 463 U.S. at 571, 103 S. Ct. at 3216 (“State courts, as much as federal courts, have a solemn obligation to follow federal law.”); Greely, 219 Mont. at 95, 712 P.2d at 765-66 (“We hold that state courts are required to *312 follow federal law with regard to [Indian reserved] water rights.”); Simonich, 29 F.3d at 1406 (“The state court is not enjoined from hearing and deciding the federal claims.”).

 Though the Tribes issued two Tribal Revocable Water Permits to the Axes, the Tribes acknowledge that the permits were unenforceable, of no legal import, and used merely as a means of information-gathering by the Tribes. Thus, the issuance of these permits did not amount to “regulation” by the Tribes.

 We acknowledge that this inquiry is similar to an application of the statutory standard in § 85-2-402(2)(a), MCA, see ¶ 10 n. 1 and ¶¶ 39-40, but we express no opinion about whether the inquiry in each context may lead to different outcomes.